**RIDLEY PARK UNITED METHODIST CHURCH**

v.

**ZONING HEARING BOARD RIDLEY PARK BOROUGH, Ridley Park Borough, Thomas O'Loughlin, Charles R. Wallgren and Joseph York**

**Appeal of: Thomas O'Loughlin Charles R. Wallgren and Joseph York.**

Commonwealth Court of Pennsylvania.

Argued March 5, 2007.
Decided April 3, 2007.

*agency in its dealings with the public.") (cita-    tion omitted).*

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and FRIEDMAN, Judge.

OPINION BY Judge PELLEGRINI.

Thomas O'Loughlin, Charles R. Wallgren and Joseph York (Property Owners) appeal from an order of the Court of Common Pleas of Delaware County (trial court) affirming the supplemental decision of the Zoning Hearing Board (Board) of Ridley Park Borough (Borough) granting a special exception to the Ridley Park United Methodist Church (Church) to operate a daycare on its property.

A similar case [1] involving the parties [2] was previously before our Court when the Church, located in an R–1 Residential District in which commercial uses are not permitted, filed an appeal from the trial court's decision reversing the Board's grant of a special exception to operate a daycare on the Church's property because it was not a public or parochial educational institution. To briefly recap the facts, the Church secured a tenant, "Ready, Set, Grow," a private, for-profit institution which intended to use the Church's property as a daycare. After the Borough denied the Church's application for a use and occupancy permit, it filed a request for a special exception under Section 213–7B(3)(b) of the Ridley Park Zoning Ordinance (Ordinance) which authorizes a special exception in R–1 Districts for "[p]ublic or parochial educational institutions and religious and philanthropic uses, excluding hospitals, sanitariums and correctional or penal institutions." Property Owners were residents of the Borough and nearby neighbors of the Church who objected to

Lee A. Stivale and Paul J. Toner, Media, for appellants.

Michael J. Sheridan, Norristown, for appellee, Ridley Park United Methodist Church.

---

1. *Thomas O'Loughlin and Linda M. O'Loughlin and Charles R. Wallgren and Judith M. Wallgren and Joseph York v. Zoning Hearing Board of Ridley Park Borough and Ridley Park Borough and Ridley Park United Methodist* *Church* (*O'Loughlin I* ) (Pa.Cmwlth., No. 2509 C.D.2001, filed September 12, 2002).

2. Linda M. O'Loughlin and Judith M. Wallgren are not a part of this appeal.

the application and testified regarding traffic problems caused by a former daycare at the same location. The Board granted the Church's application for a special exception concluding that the for-profit daycare did not qualify as a religious or philanthropic use due to its function as a landlord for economic gain, but that the educational component was sufficient to satisfy the educational requirements in the Ordinance. Without taking additional evidence, the trial court reversed, and the Church filed an appeal with this Court.

On appeal, the Church argued that a daycare situated on its property met the requirements of the Ordinance because it was a "parochial educational institution." We disagreed, citing *Camp Ramah in the Poconos, Inc. v. Zoning Hearing Board of Worcester Township*, 743 A.2d 1019 (Pa. Cmwlth.2000), for the proposition that a summer camp run by and for practitioners of a particular religion which included a religious component did not change the recreational nature of the use of the property into a religious use. Because the daycare in *O'Loughlin I* had no religious affiliation with the Church, no religious services would be offered, and proximity alone would not transform a secular, for-profit entity into a religious one, we affirmed the trial court's denial because the daycare was not a "parochial" institution. The Church then filed a petition for allowance of appeal with our Supreme Court, which was denied.[3]

The Church then filed a new application, which is the subject of this appeal, requesting a special exception for the Church itself to operate a daycare on its property. Eileen Guest (Guest), who for two-and-one-half years owned and operated "Ready, Set, Grow" located on the

Church's property, testified that 60 to 65 children attended the daycare on a daily basis, with six being kindergarteners. She testified that "Ready, Set, Grow" was licensed by the Department of Education certifying that it was approved as a private academic school to offer kindergarten programs. She then referred to the kindergarten curriculum which included courses on language arts/reading, math, gross motor skills, science, coordination, social studies and other cognitive skills, and the preschool curriculum which included courses on language arts, math, gross motor skills, science, coordination and social studies.

While she had operated the daycare as a tenant of the Church, when the Church-run daycare center opened, she would be employed and paid by the Church in the position of Executive Director, and the Church would take over her existing staff. She testified that the proposed school would offer full-day kindergarten, pre-kindergarten, preschool, toddler and infant programs, as well as after-school and summer camp programs. She also stated that the proposed daycare would operate under the same hours as the current daycare, and Pastor Alice Ann Bonham (Pastor), the Pastor of the Church, would develop a religious element for the current curriculum.

The Pastor testified that if the application was granted, the Church would operate the daycare through a Board of Directors consisting of Church members. She testified that the religious component of the program was still a work in progress, and that the role of the daycare in the Church's mission was to preach the Gospel of Jesus Christ and to serve the

---

**3.** *O'Loughlin v. Zoning Hearing Board of Ridley Park Borough*, 575 Pa. 689, 834 A.2d 1144 (2003).

needs of the community by providing a safe place for children.

Finding that the attempted characterization of the use as being religious or parochial appeared to be form over substance because the daycare would be operated in exactly the same manner as the current unlawful use,[4] the Board denied the application. It found that although the Church intended to take over operation of the daycare and to include religious education in the future, there was insufficient evidence to demonstrate that the use was parochial in nature. It also found that based on a narrowed definition of an educational institution, the daycare was a for-profit business that was principally dedicated to the care of the children and not their education.

The Church appealed to the trial court and then filed an amended appeal petitioning to have the matter remanded to the Board for a determination of whether the provisions of the Religious Freedom Protection Act (RFPA), Act of December 9, 2002, P.L. 1701, 71 P.S. §§ 2401–2407, were applicable to its application. The trial court granted the petition and remanded the matter for the Board to receive testimony and argument with regard to the applicability of the RFPA and to submit a supplemental decision with regard to that issue.

Between the initial hearing and the remand hearing, pertinent facts on the religious component of the daycare changed. At the remand hearing, the Pastor testified that the Church now operated the daycare, a lease with the daycare run by Guest was terminated, Guest no longer owned the daycare but was an employee of the Church, the daycare staff was employed and paid by the Church, an oversight committee comprised of Church members made the decisions pertaining to the operation of the daycare, and the Church paid for the insurance. The Pastor stated that the Church added a Christian educational component to the program for the toddler through kindergarten-aged children, including a Bible Zone curriculum which offered one or two daily religious activities for 10 to 20 minutes or longer, and a weekly chapel service attended by the children with the exception of infants. However, she testified that children could opt out of the weekly chapel service and the implementation of a religious element for the after-school program was a work in progress. The Pastor then stated that neither Guest nor any of the daycare staff were Church members, only one Church member had children enrolled in the daycare, and the United Methodist Church did not maintain statistics on the proportion of its churches that provided daycare or educational programs.

With respect to the mission of the Church to teach the Gospel of Jesus Christ to all the Church encountered, the Pastor stated that there was no better place to start than with the children. She also testified that part of the mission was to reach out and meet the needs of the community, including a safe place for children to be while their parents were working. The Pastor testified that historically, the Methodists as a people had met secular needs and as a denomination, the Church considered meeting secular needs equally important. She stated that a denial of the application would substantially burden the exercise of religion because the Church was responsible for preaching the Gospel by word and by action to the community. The Pastor also testified that the Ordinance did not require the Church to con-

---

**4.** Even though a permit was denied in *O'Loughlin I,* the Church's tenant continued to operate a daycare on the Church's property.

duct any activity that would violate any tenet of the Church, and that nothing in the Ordinance would curtail the Church and its members from expressing adherence to their religious faith. She conceded that the Church continued to operate and function without limitation, and that it was not precluded from offering numerous outreach religious programs to children and adults, including Sunday school, vacation Bible school, religious workshops for members, special holiday services, counseling and coffee hour the first Sunday of each month.

Considering the Church's 100–year presence in the Borough and its substantial dedication to fostering the principles of Christianity in the community, as shown more recently by the incorporation of a Christian daycare, the Board granted a special exception with conditions because to prohibit the daycare would substantially burden the Church's exercise of its religion. It found that the Church now operated the daycare and added a substantial Christian educational component that was not demonstrated at previous hearings. It stated that despite the very narrow scope of the remand order, the new findings of fact and expounding of the religious aspect of the daycare would very well be in compliance with the Ordinance mandating a reapplication of the standards for a special exception. Property Owners appealed the Board's supplemental decision, and the Church appealed the conditions attached to that decision.

Without taking additional evidence, the trial court denied both appeals and dismissed as being moot the Church's appeal from the Board's original decision. The trial court found, among other things, that it had authority to remand the matter because the Board had not considered the applicability of the RFPA or made findings in that regard; the Board was vested with subject matter jurisdiction to determine a violation of the RFPA; the Board's findings that the daycare was a fundamental and substantial mission of the Church and furthered the fundamental principles of the Church community were supported by substantial evidence; and the Church met its burden for the grant of a special exception.

Property Owners appealed to this Court [5] contending that the Board erred in finding that a denial of the Church's application for a special exception to operate a daycare would violate the Church's rights under the RFPA because the Church's free exercise of religion was not substantially burdened as it was not denied the right to engage in activities which were fundamental to its religion.

The genesis of the RFPA was a result of the United States Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Prior to that decision, all legislation affecting religions or religious practices challenged under the Free Exercise Clause of the First Amendment was subjected to a strict scrutiny analysis. [6]

**5.** Because the trial court took no additional evidence, our scope of review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Rabenold v. Zoning Hearing Board of the Borough of Palmerton,* 777 A.2d 1257 (Pa.Cmwlth. 2001).

**6.** There are three different types of classifications calling for three different standards of

judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. In the second type of cases, where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied called strict scrutiny. Finally, in the third type of cases, if "important" though not fun-

*Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Smith*, the Supreme Court held that the Free Exercise Clause did not prohibit application of Oregon's drug laws to the ceremonial ingestion of peyote and, thus, the state could, consistent with that Clause, deny claimants unemployment compensation for work-related misconduct based on their use of the drug. The Supreme Court stated:

> The Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* . . . ." The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all "governmental regulation of religious *beliefs* as such." The government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

*Smith*, 494 U.S. at 876–77, 110 S.Ct. 1595. (Citations omitted.) It went on to hold that although a state would violate the Free Exercise Clause if it sought to ban the performance of or abstention from physical acts solely because of their religious motivation, the Clause does not relieve an individual of the obligation to comply with a law that incidentally forbids or requires the performance of an act that his religious belief requires or forbids if the law is not specifically directed to religious practice and is otherwise constitutional as applied to those who engage in the specified act for non-religious reasons. Thus, a law that is both neutral and generally applicable need only be "rationally related" to a legitimate governmental interest to survive a constitutional challenge. On the other hand, if a law that burdens a religious practice is not neutral or generally applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest. In *Smith*, the Supreme Court also stated that its decision did not dilute the authority of Congress and states to enact laws that protect its citizens' right to freely practice their religious beliefs.

■ Congress accepted the Supreme Court's invitation in *Smith* to enact laws that affirmatively foster the free exercise of religion because as reaffirmed by the United States Supreme Court in *Cutter v. Wilkinson*, 544 U.S. 709, 713, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), "there is room for play in the joints" between the Free Exercise and Establishment Clauses. Pursuant to this authorization,[7] Congress

---

damental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review or a heightened standard of review. *See Nicholson v. Combs*, 550 Pa. 23, 703 A.2d 407 (1997).

The heightened standard of review lessens the presumption that a statute is constitutional because it allows the court to weigh the proffered reasons why the restrictions are against the rights purportedly being infringed upon. Strict scrutiny goes even further, as Tribe, *American Constitutional Law* (Second Edition), Section 16–6 quipped: "[w]hen expressed as a standard for judicial review, strict scrutiny is . . . 'strict' in theory and usually 'fatal' in fact."

7. Congress first responded to the change in level of scrutiny by enacting the Religious

enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc–2000cc–5, which provided that a land-use regulation cannot substantially burden religious exercise unless the government can show the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest. It broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." [8] The RLUIPA applies in any cases in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance ...; the substantial burden affects, or removal of that substantial burden would effect, commerce ...; or the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes

... individualized assessments of the proposed uses for the property involved." [9]

■ Like the federal government, Pennsylvania enacted RFPA to change the rational relationship analysis which was used after *Smith* to examine whether a law or ordinance impinged on the exercise of one's religion. It requires that a law or regulation that has an effect on the exercise of religion has to establish that the agency did not substantially burden a person's [10] free exercise of religion, including any burden which results from a rule of general applicability, i.e., unless the agency proves, by a preponderance of the evidence, that the burden is in furtherance of a compelling interest of the agency and is the least restrictive means of furthering that interest.[11] It defines "free exercise of religion" [12] as "[t]he practice or observance of religion under section 3 of Article I of the Constitution of Pennsylvania," [13] and "substantial burden" as:

---

**8.** 42 U.S.C. § 2000cc–5(7)(A).

**9.** 42 U.S.C. § 2000cc(a)(2).

**10.** Section 3 of the RFPA, 71 P.S. § 2403, defines "person" as:

> An individual or a church, association of churches or other religious order, body or institution which qualifies for exemption from taxation under section 501(c)(3) or (d)

Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb–2000bb–4, which "prohibits '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.' " *City of Boerne v. Flores,* 521 U.S. 507, 515–16, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (*citing* 42 U.S.C. § 2000bb–1). In *City of Boerne,* the United States Supreme Court invalidated RFRA as applied to states and their subdivisions because it exceeded Congress' remedial powers under the Fourteenth Amendment.

of the Internal Revenue Code of 1986 (Public Law 99–514, 26 U.S.C. § 501).

**11.** Section 4 of the RFPA, 71 P.S. § 2404, provides:

> (a) General rule.—Except as provided in subsection (b), an agency shall not substantially burden a person's free exercise of religion, including any burden which results from a rule of general applicability.
> (b) Exceptions.—An agency may substantially burden a person's free exercise of religion if the agency proves, by a preponderance of the evidence, that the burden is all of the following:
> (1) In furtherance of a compelling interest of the agency.
> (2) The least restrictive means of furthering the compelling interest.

**12.** Section 3 of the RFPA, 71 P.S. § 2403, (defining "free exercise of religion").

**13.** Article 1, Section 3 of the Pennsylvania Constitution provides:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no

An agency action which does any of the following:

(1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs.

(2) Significantly curtails a person's ability to express adherence to the person's religious faith.

**(3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion.**

(4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

Section 3 of the RFPA, 71 P.S. § 2403 (defining "substantially burden"). (Emphasis added.)

What is at issue in this case is whether the Church would be "substantially burdened" if it was precluded from operating a daycare center because it would lose "a reasonable opportunity to engage in activities which are fundamental to [its] religion." [14]

■ We agree with Property Owners that nothing here impinges on the religious activities of the Church. While it aided in carrying out the Church's religious mission, the daycare is not a fundamental religious activity of a church. For example, ministering to the sick can flow from a religious mission, but it is not a fundamental religious activity of a church because a hospital may be built to satisfy that mission. Moreover, the lack of a daycare only had a *de minimis* impact on the Church's opportunity to engage in fundamental religious activities to teach religious classes because, as the Pastor testified, the Sunday school, vacation Bible school, religious workshops for members, special holiday services, counseling and coffee hour the first Sunday of each month all provided religious instruction. Because the Church failed to meet its burden of proving that it was substantially denied a reasonable opportunity to engage in activities that were fundamental to its religion, the Board erred in granting the Church's application to operate a daycare on its property based on a violation of the RFPA. *See also Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir.2006) (denying church zoning permits to operate daycare facility with component of religious instruction in low-density residential area did not impose "substantial burden" [15] on

man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.

14. There was no evidence presented that the operation of a daycare was mandated by the Church's sincerely held religious beliefs, and the Pastor neither testified that the Ordinance required the Church to conduct any activity that would violate any tenet of the Church nor that it curtailed the Church and its members from expressing adherence to their religious faith. We are then left with deciding whether the Church would be denied a reasonable opportunity to engage in activities which are fundamental to its religion if the application for a special exception to operate a daycare was denied.

15. To meet the substantial burden prong of the RLUIPA, a person must demonstrate that the land-use regulation actually imposed a substantial burden on religious exercise. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760–61 (7th Cir.2003). It requires a showing that the burden prevents adherents from conducting or expressing their religious beliefs or causes them to forgo religious precepts. *Jimmy Swaggart Ministries v. Board of Equalization of California*, 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990). A substantial burden is one that "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable." *Civil*

church's free exercise rights because only an incidental burden on church's religious conduct because church could operate its religious education program in another area of city that was properly zoned for such operation.) [16]

■ Property Owners also contend that the Board erred in granting a special exception under the Ordinance based on the findings of fact from the remand hearing allegedly demonstrating that the Church implemented a substantial Christian educational component to its daycare program because the trial court's remand order limited the Board to a determination of whether the RFPA applied to the Church's application. We agree because "where a case is remanded for a specific and limited purpose, 'issues not encompassed within the remand order' may not be decided on remand." *In re Independent School District Consisting of the Borough of Wheatland,* 912 A.2d 903, 908 (Pa. Cmwlth.2006) (*citing Budd Company v. Workers' Compensation Appeal Board (Kan),* 858 A.2d 170, 180 (Pa.Cmwlth. 2004)). Because the trial court limited the remand order to a determination of the applicability of the RFPA to the Church's application, the Board erred in expanding the narrow scope of that order and revisiting the status of the Church as a parochial educational institution under the Ordinance.

This does not end the matter, though. Because we have found that the Ordinance does not violate the RFPA, the Church's appeal to the trial court from the Board's original decision that it was not a parochial educational institution is no longer moot. Accordingly, we vacate the trial court's order affirming the Board's supplemental decision granting a special exception and remand the matter to the trial court to address the Church's appeal and decide based on all the evidence adduced at the initial and remand hearings whether the Church made out that it is entitled to a special exception under Section 213–7B(3)(b) of the Ordinance as a "parochial educational institution."

Judge FRIEDMAN concurs in the result only.

### *ORDER*

AND NOW, this *3rd* day of *April,* 2007, we vacate the Court of Common Pleas of Delaware County's order affirming the Zoning Hearing Board of Ridley Park Borough's supplemental decision granting a special exception and remand the matter to the Court of Common Pleas of Delaware County to address the Church's appeal to the Zoning Hearing Board of Ridley Park Borough's original decision and decide based on all the evidence adduced at the initial and remand hearings whether the Church made out that it is entitled to a

---

*Liberties for Urban Believers,* 342 F.3d at 761. A mere inconvenience is not enough to meet the substantial burden requirement. *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

**16.** Property Owners also contend that the trial court erred in remanding the matter to the Board for a determination of whether the RFPA applied to the Church's application because the Board was a quasi-judicial body, not an agency vested with subject matter jurisdiction, and a violation of the RFPA by a

municipality was proper only before the Court of Common Pleas. They further argue that both the RFPA and the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202, specifically limited the Board from granting any type of relief in this matter. Because the Church did not meet its burden under the RFPA, we reserve for a later date a determination of whether a zoning hearing board has jurisdiction in such matters.

special exception under Section 213–7B(3)(b) of the Ridley Park Zoning Ordinance as a "parochial educational institution."