[No. B194230. Second Dist., Div. Seven. Oct. 3, 2007.]

SCOTTISH RITE CATHEDRAL ASSOCIATION OF LOS ANGELES
et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents;
WINDSOR SQUARE ASSOCIATION, Intervener and Respondent.

**COUNSEL**

Roger Jon Diamond and Roman P. Storzer for Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, Jeri L. Burge, Assistant City Attorney, and Tayo A. Popoola, Deputy City Attorney, for Defendants and Respondents.

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Intervener and Respondent.

**OPINION**

**PERLUSS, P. J.**—The Scottish Rite Cathedral Association of Los Angeles (SRCALA), a nonprofit mutual benefit corporation that built and owns the *Scottish Rite Cathedral* (Cathedral) located in the mid-Wilshire district of Los Angeles, and a private entity named Los Angeles Scottish Rite Center, LLC (LASRC), which currently operates the Cathedral under a lease with SRCALA, appeal from the denial of their petition for writ of administrative mandamus challenging the City of Los Angeles's (City) revocation of the Cathedral's certificate of occupancy, an action that bars the use of the Cathedral for any purpose unless a new certificate of occupancy is granted. SRCALA and LASRC contend the City's actions impermissibly burdened the exercise of their religious beliefs in violation of the Religious Land Use and Institutionalized Persons Act of 2000, title 42 United States Code section 2000cc et seq. (RLUIPA). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Scottish Rite Cathedral*

Between 1958 and 1959 SRCALA sought and received a zoning change, a variance and a building permit to allow the construction of a four-story Masonic temple and parking lot on a parcel on Wilshire Boulevard bordering the affluent residential neighborhood of Hancock Park. In January 1963 the City issued a certificate of occupancy for the new Cathedral, which housed an auditorium with a capacity of 2,020 persons, an assembly room with an occupancy of 1,880 persons, a dining room accommodating 860 persons and several small class and lodge rooms. According to the City's planning file,[1] representatives of SRCALA had pledged during the quest for City approval the building would not be rented out or used for commercial purposes. Based on SRCALA's representations that only charitable and nonprofit organizations would use the facility, the City approved the project with only 259 parking spaces, about half of the parking that would have been required for commercial use.

From its inception SRCALA allowed nonprofit religious and community organizations to lease the premises for non-Masonic events.[2] The building was also leased to a handful of businesses, film production companies and individuals for private functions. In the late 1970's, as membership began to decline, it became necessary for SRCALA to fund its operations by increasing income from rentals to both commercial and nonprofit organizations. Predictably, increased rentals intensified parking-related impacts on the surrounding neighborhood and generated an increase in complaints. In 1979 the City's Department of Building and Safety confirmed the absence of any existing limitations on rental of the building to nonprofit organizations or private parties affiliated with the Masons, but noted any accessory use of the building as an auditorium for commercial purposes would require SRCALA to obtain a variance.[3] Notwithstanding these clear limitations SRCALA

---

[1] The administrative record consists of 32 volumes comprised of files from the various City departments that regulated the Cathedral since its planning and erection, as well as the records of the administrative proceedings under review in this appeal.

[2] In the 1960's and 1970's nonprofit groups that sponsored non-Masonic events at the building included an impressive roster of ecumenical and philanthropic organizations, ranging from the Stephen S. Wise Temple to the Church of Jesus Christ of Latter Day Saints, the Children's Home Society to the Japanese Christian Youth Federation, the Los Angeles Police Department to the Classical Ballet Foundation and the Armenian Cultural Society to the State Bar of California Committee of Bar Examiners.

[3] In 1980 the City adopted an ordinance establishing the Park Mile Specific Plan, which encompassed the Cathedral but did not alter the uses allowed under the existing zoning of CR (limited commercial). Both the CR zoning designation and the Park Mile designation permitted the Cathedral to operate as a "club or lodge (nonprofit)" or "museum or library (nonprofit)."

continued to lease the building for commercial events.[4] During the 1980's the City issued two citations to SRCALA for zoning violations based on improper use of the Cathedral.

## 2. *The 1993 Nuisance Abatement Proceedings*

In 1993 the City initiated public nuisance abatement proceedings after receiving "numerous letters and statements" citing the Cathedral as "a frequent source of [parking, noise, and trash] problems for the residents of the attractive, well-maintained, residential estate neighborhood surrounding the property." After a public hearing an associate zoning administrator for the City concluded the Cathedral constituted a public nuisance and imposed conditions of use on its continued operation, including a prohibition on use of the property "for any purpose other than for nonprofit activities directly related to the purpose and function of the Scottish Rite Masonic Temple." The board of zoning appeals conducted two additional hearings and subsequently denied SRCALA's appeal, affirming the finding of public nuisance and modifying slightly the conditions imposed by the zoning administrator to allow use by certain "bona-fide nonprofit non-Masonic organizations." SRCALA's appeal to the city council was denied, and the mayor approved the council's action in December 1993.

SRCALA did not seek an administrative writ of mandamus or otherwise challenge the City's action and, concluding it could not financially operate the Cathedral under the conditions imposed by the City, ceased operations shortly after the City's action and closed the building.

## 3. *The 2003 Nuisance Abatement Proceedings*

The Cathedral was shuttered for nearly 10 years. In 2002 SRCALA entered into a long-term lease allowing a newly formed limited liability company, LASRC, to open and operate the Cathedral. LASRC refurbished the facility and began hosting events later that year. In promoting the building LASRC referred to the Cathedral variously as the Wilshire Windsor Pavilion, the Wilshire International Pavilion, the International Cultural Center and the Scottish Rite Temple. One of the first major events hosted by LASRC at the

---

Both zones bar public auditoriums and churches or other religious uses, but the Cathedral had been historically treated as a private lodge.

[4] Nonconforming events preceding the 1993 nuisance complaint include an antique show and associated retail sale; Tsigane, a production of the Moscow-based Roman Gypsy Theatre; a lecture by Dr. Rollo May; a Pepsi-sponsored event featuring Magic Johnson; Fourth Annual Mac[intosh Computer]Fest; the Bel Canto Symphony Orchestra; multiple performances of A Christmas Carol; an Actor's Fund Celebrity Blood Drive; Farmers Insurance claims adjusters' meetings; an Occidental Petroleum shareholders' meeting; and multiple concerts and political, as well as charitable, fundraisers.

Cathedral celebrated the opening of the American Heritage Masonic Museum,[5] but LASRC simultaneously publicized its intention to rent the building for public use of its theater and banquet facility.

In July 2003 in response to renewed neighborhood complaints, the City initiated a review of LASRC's compliance with the conditions imposed in 1993. A staff report disclosed LASRC was not only operating in violation of the 1993 conditions but also had been cited for its failure to obtain necessary business tax certificates or police and fire permits. A public hearing on July 17, 2003 confirmed LASRC's failure to comply with the 1993 conditions and its admission that renting out of the auditorium was necessary to generate income for maintenance of the facility. In a report issued on January 17, 2004, the zoning administrator substantially retained the limitations imposed in 1993 but tightened two principal conditions related to use of the building and parking. The first barred use of the Cathedral by non-Masonic organizations, even if the purpose was philanthropic or religious in nature. The second modification barred the Cathedral from charging fees for parking and required the lot be operated as a free parking facility for persons attending functions at the Cathedral. Concluding, the zoning administrator stated, "The basic problem with this facility is that it was established as a masonic lodge use with parking requirements based accordingly . . . . Over time the use of the property has been illegally expanded to include a[n] entertainment venue with parking demands greatly exceeding [those] originally provided. . . . [¶] . . . It may well be that given the nature of the facility and its proximity to a fully developed single family area, the use of the subject property as a nonprofit lodge is no longer appropriate."

After additional public hearings, the city council voted to adopt the findings of the zoning administrator; on April 21, 2004 the mayor concurred.

4. *The Revocation Proceedings*

Despite the City's action, LASRC continued its practice of renting the Cathedral to non-Masonic organizations. Although some of the events appeared to be religiously oriented, most fell into the category of performance entertainment.[6] On June 29, 2004 the City's Department of Building and

---

[5] Although this event purported to allow tax deductions for charitable contributions to the museum, donors were instructed to make their checks payable to LASRC, a private, for-profit, limited liability company.

[6] For example in May 2004 the following public events were staged at the Cathedral auditorium: Buddhist Traditional Ceremony and Art Performance, Ram Productions (unspecified event), and Heaven and Hell Productions (unspecified event). In subsequent months the Cathedral was the site for Jesus Jesus (musical), Hofa'ah Productions (unspecified event), Fabric of a Man (musical comedy), High Holy Days services, National Chorus of Korea

Safety issued an order to comply with the 2004 conditions finalized in April 2004. Complaints from neighbors continued. In February 2005 the department of building and safety was informed that a boxing match was being advertised by LASRC on Ticketmaster, a for-profit ticket agency, again in violation of the conditions of use. The professional boxing match took place as advertised, and two City inspectors attended the event. They confirmed tickets had been purchased through Ticketmaster and observed alcohol being sold without the required conditional use permit.

On March 22, 2005 the zoning administrator conducted a public hearing to review "compliance with conditions previously imposed by the City Council." The zoning administrator concluded the Cathedral "continues to operate in violation of conditions imposed . . . and has been and continues to be a public nuisance." More specifically, the zoning administrator found, "The owner or operator has failed to demonstrate, to the satisfaction of the Director, the willingness or ability to eliminate the problems associated with the use. . . . [¶] . . . As a consequence, the inevitable result is requiring the discontinuance of the masonic lodge use at this site."

SRCALA and LASRC's appeal of the zoning administrator's decision to the city council was rejected; on September 29, 2005 the mayor approved the council's action.

5. *The Petitions for Writ of Mandate*

On July 21, 2004, following the City's adoption of the 2004 conditions on the use of the Cathedral, SRCALA and LASRC filed their first petition for writ of administrative mandate in the superior court. For reasons not explained in the record, the hearing on that petition was continued for more than a year. On October 4, 2005, while the first petition was still pending, SRCALA and LASRC filed a second petition challenging the City's revocation of the Cathedral's certificate of occupancy. The petitions were consolidated, and a hearing conducted on August 29, 2006. In an order dated September 8, 2006 the trial court denied both petitions.

## CONTENTIONS

The central question raised in this appeal is whether the City's revocation of SRCALA's long-standing certificate of occupancy violated SRCALA's or LASRC's rights under RLUIPA. The superior court held, without analysis,

(musical concert), L.A. Social Club monthly parties, Chocolate Nutcracker (dance performances), Poliker (concert), Third Annual Tu B'Shevat, Seder, Valentine's Day Comedy Expo, and Classic Championship Boxing Series.

that RLUIPA did not protect either entity because "the 'Freemason' organization is [not] a religion." SRCALA and LASRC contend RLUIPA protects religious exercise "whether or not compelled by, or central to, a system of religious belief" (42 U.S.C. § 2000cc-5(7)(A)) and subjects the City's actions to strict scrutiny, thus requiring the City to select the least restrictive alternative for any remedial action burdening use of the Cathedral for religious exercise.

## DISCUSSION

### 1. *Standard of Review*

Code of Civil Procedure section 1094.5 governs judicial review by administrative mandate of any final order or decision rendered by a state or local agency. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137 [93 Cal.Rptr. 234, 481 P.2d 242].) Subdivision (b) of section 1094.5 provides that judicial review of such a decision shall "extend to the questions whether the [agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

SRCALA and LASRC claim the trial court erred as a matter of law in concluding RLUIPA did not apply to protect their use of the Cathedral. The proper interpretation of a statute and the application of the statute to undisputed facts are questions of law, which we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *California Veterinary Medical Assn. v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 546 [61 Cal.Rptr.3d 318].)

### 2. *The Masonic Principles of the Scottish Rite*

As a Masonic brochure included in the record explains, "The Scottish Rite is a part of the family of Freemasonry." "Freemasonry is the oldest, and by far, the largest fraternal order in the world." Although "[i]t is religious in

character, . . . it is not a religion. It is founded upon the basic principle of the Brotherhood of Man under the Fatherhood of God, and everyone who comes into its Lodges must express a belief *in* God." "One of Freemasonry's objectives is the making of better men. . . . It aims to inculcate in the minds of those who come into it some of those virtues which are recognized as prerequisites for a better life. Its teachings included brotherhood, morality, justice, tolerance, citizenship, education and freedom of ideas, of religious choice, of expression."[7]

As a commonly cited source explains, "Freemasonry has often been described as ' "a science of morality, veiled in allegory and illustrated by symbols." ' " (*Bressler v. American Feder. of Human Rights* (10th Cir. 2002) 44 Fed.Appx. 303, 308, quoting Mackey, The Symbolism of Freemasonry (1869) ch. X <http://www.fullbooks.com/The-Symbolism-of-Freemasonry.html> [as of Oct. 3, 2007].) "Starting with the essential compass, square and volume of sacred law, a 'very rich and complex symbolic structure' plays a central role in Masonic study and practice: '[t]he candidate for Masonry is introduced to that symbolic structure by participating in the ritual dramas, called "Degrees," through which Freemasonry communicates its teaching of morality.' " (*Bressler*, at p. 308, quoting MacNulty, Freemasonry: A Journey Through Ritual and Symbol (1991) p. 6.)

"The Freemasons have adopted various systems, or 'rites,' governing the personal advancement of members through the progression of hierarchical 'degrees.' The popular 'Scottish Rite,' for example, delineates a progression from 4 [degrees] to 32 [degrees] based upon a member's mastery of prescribed lessons teaching Masonic values and principles, among them faith, hope, universal benevolence, trustworthiness, fidelity, integrity, religious tolerance, the dignity of labor, and duty to family, country, and God." (*Bressler v. American Feder. of Human Rights*, *supra*, 44 Fed.Appx. at p. 309, fn. omitted; see generally Pike, Morals and Dogma of the Ancient and Accepted Scottish Rite of Freemasonry (1906) <http://www.freemasons-freemasonry.com/apikefr.html> [as of Oct. 3, 2007].) "Qualification for the degrees is an educational process, teaching the Mason the duty of obedience to law, the virtues of industry and honesty, the principles of justice, the importance of religion, patriotism and ethical behavior. Conferral of these degrees is accompanied by a ritual. To be eligible for a degree, the applicant must believe in God. Each member is encouraged to possess religious beliefs

---

[7] While far less visible today, Freemasonry has flourished in the United States since Revolutionary War times. Famous American Freemasons include Presidents George Washington, James Monroe, Andrew Jackson, Franklin Roosevelt and Harry S. Truman; Supreme Court Justices Hugo L. Black, William O. Douglas, Earl Warren, Potter Stewart and Thurgood Marshall; Senators Birch Bayh, Robert Dole, Everett Dirksen, Sam Nunn and Robert Byrd; and other notable figures such as Benjamin Franklin, Henry Clay, John Jacob Astor, William Jennings Bryan, General Douglas MacArthur, Arnold Palmer and Will Rogers.

and to lead a religiously directed life. At any meeting of the Scottish Rite . . . a Bible must be on the altar." (*Estate of Allen* (1971) 17 Cal.App.3d 401, 406 [94 Cal.Rptr. 648].) As the *Allen* court summarized, "The order's philosophical doctrine includes strong religious elements derived from Judaic and Christian sources, urging faith in God and emphasizing the Bible. Abstaining from sectarian theology and denominationalism, the doctrine insists upon individual freedom of religion." (*Id.* at p. 410; see also *Ancient and Accepted Scottish Rite of Freemasonry v. Board of County Commissioners* (1932) 122 Neb. 586, 591–592 [241 N.W. 93, 95] ["[Masonry] teaches as a foundation principle faith in God and immortality of the soul. [It] is not sectarian in its religious teaching [but] aims to bring its devotees a deeper and more conscious contact with spiritual things. To the extent that religious purposes include the field of morals, masonry makes common cause with organized religion"]; *State Tax Bd. v. Adoniram Tr.* (1969) 145 Ind.App. 300, 302 [250 N.E.2d 605, 606] [" '[Masonry] teaches and stands for the worship of God, for truth and justice, liberty and enlightenment, fraternity and philanthropy' "].)

### 3. *RLUIPA*

"RLUIPA is the latest skirmish in a tug of war between Congress and the Supreme Court over the meaning and application of the Free Exercise Clause of the United States Constitution." (Lennington, *Thou Shalt Not Zone: The Overbroad Applications and Troubling Implications of RLUIPA's Land Use Provisions* (2006) 29 Seattle U. L.Rev. 805, 806–807.) Adopted in response to the Supreme Court's partial invalidation of the Religious Freedom Restoration Act of 1993, title 42 United States Code section 2000bb (RFRA), in *City of Boerne v. Flores* (1997) 521 U.S. 507 [138 L.Ed.2d 624, 117 S.Ct. 2157], RLUIPA applies to a government's implementation of land use regulations so long as the government makes, or has in place procedures allowing it to make, "individualized assessments of the proposed uses for the property involved." (42 U.S.C. § 2000cc(a)(2)(C).) If applicable, RLUIPA prohibits a government from implementing a land use regulation in a way that "imposes a substantial burden" on one's "religious exercise" unless the burden satisfies strict scrutiny.[8] In passing the RLUIPA, Congress intended to relax the requirement under First Amendment jurisprudence that the "religious exercise" be central to the individual's religion. Under RLUIPA, free exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." (42 U.S.C. § 2000cc-5(7)(A).)

---

[8] Section (a)(1) of RLUIPA provides: "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—[¶] (A) is in furtherance of a compelling interest; and [¶] (B) is the least restrictive means of furthering that compelling governmental interest." (42 U.S.C. § 2000cc(a)(1).)

Particularly relevant to our inquiry here, RLUIPA provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." (42 U.S.C. § 2000cc-5(7)(B).)

### 4. *SRCALA and LASRC's Use of the Cathedral Does Not Constitute Religious Exercise Under RLUIPA*

In analyzing SRCALA and LASRC's RLUIPA claim, the threshold question is whether the Cathedral was being used for the purpose of religious exercise. The superior court summarily rejected the claim of religious exercise on the ground "freemasonry is not a religion." That conclusion, however, is not enough in light of RLUIPA's express instruction the exercise at issue need not be "compelled by, or central to, a system of religious belief" to constitute "religious exercise." (42 U.S.C. § 2000cc-5(7)(A).)

The broad sweep of this statutory mandate[9] has been applied to activities as divergent as religiously affiliated schools (see, e.g., *San Jose Christian College v. Morgan Hill* (9th Cir. 2004) 360 F.3d 1024; *Ventura County School v. City of San Buenaventura* (C.D.Cal. 2002) 233 F.Supp.2d 1241, 1243), nonprofit hospitals (*Sisters of St. Francis Health v. Morgan County, IN* (S.D.Ind. 2005) 397 F.Supp.2d 1032) and faith-based crisis centers (see, e.g., *Men of Destiny Ministries, Inc. v. Osceola County* (M.D.Fla. 2006) 20 Fla. L. Weekly Fed. D. 314). At the same time, we share the Second Circuit's misgivings about RLUIPA's apparent reach insofar as it purports to favor all religiously oriented uses over identical secular uses: "RLUIPA occupies a treacherous narrow zone between the Free Exercise Clause, which seeks to assure that government does not interfere with the exercise of religion, and the Establishment Clause, which prohibits the government from becoming entwined with religion in a manner that would express preference for one religion over another, or religion over irreligion." (*Westchester Day School v. Village of Mamaroneck* (2d Cir. 2004) 386 F.3d 183, 189.)

In light of the Masonic practices and principles outlined above, however, we see no principled way to distinguish the earnest pursuit of these principles, chief among which are the reverence of a Supreme Being and the embrace of other forms of religious worship, from more widely acknowledged modes of religious exercise.[10] The record certainly contains evidence

---

[9] As the Seventh Circuit has explained, "This definition reveals Congress's intent to expand the concept of religious exercise contemplated both in decisions discussing the precursory RFRA, [citation], and in traditional First Amendment jurisprudence." (*Civil Lib. for Urban Believers v. City of Chicago* (7th Cir. 2003) 342 F.3d 752, 760.)

[10] We have found no decisions analyzing whether Masonic practices are sufficiently religious in nature to qualify for protection under RLUIPA, nor have the parties identified any

the Cathedral was used almost exclusively for philanthropic and religious purposes through the mid-1970's. On the other hand, the record reveals such activities became fiscally insufficient to sustain SRCALA's operation of the Cathedral, which, over the years preceding the City's initial nuisance action in 1993, transitioned use of the Cathedral to a mélange of cultural and commercial events with a declining nexus to Masonic principles or other religious exercise. Acknowledging these developments, SRCALA and LASRC argue RLUIPA extends its protection even to those nonreligious activities necessary to financially support the Cathedral's continued operation.

■ As broad as RLUIPA's language may be, however, Congress's view of its application was narrower than that espoused by SRCALA and LASRC: Specifically, a burden on a commercial enterprise used to fund a religious organization does not constitute a substantial burden on "religious exercise" within the meaning of RLUIPA. The joint statement of Senators Hatch and Kennedy introduced upon the Senate's consideration of RLUIPA notes that, despite the broad definition of "religious exercise" as the "use, building, or conversion" of real property for religious exercise, " 'not every activity carried out by a religious entity or individual constitutes "religious exercise." In many cases, real property is used by religious institutions for purposes that are comparable to those carried out by other institutions. While recognizing that these activities or facilities may be owned, sponsored or operated by a religious institution, or may permit a religious institution to obtain additional funds to further its religious activities, this alone does not automatically bring these activities or facilities within the bill's definition [of] "religious exercise." For example, a burden on a commercial building, which is connected to religious exercise primarily by the fact that the proceeds from the building's operation would be used to support religious exercise, is not a substantial burden on "religious exercise." ' " (*Westchester Day School v. Village of*

such authority to us. We have considered, however, numerous attempts by courts to define more particularly the nature of religious belief and found especially useful the opinions in *U.S. v. Meyers* (D.Wyo. 1995) 906 F.Supp. 1494, affirmed (10th Cir. 1996) 95 F.3d 1475 (concluding professed belief in Church of Marijuana not a religious belief within meaning of RFRA), and *Friedman v. Southern Cal. Permanente Medical Group* (2002) 102 Cal.App.4th 39 [125 Cal.Rptr.2d 663] (concluding veganism is not religious creed within definition of California Fair Employment and Housing Act, Gov. Code, § 12900 et seq.). The *Meyers* court adopted a multipart test inquiring into (1) the ultimate ideas embraced by the asserted belief; (2) metaphysical ideas addressing transcendence of the physical world; (3) moral or ethical systems constraining an adherent's conduct; (4) comprehensiveness of beliefs; and (5) accoutrements of religion such as a founder or teacher, important writings, gathering places, keepers of knowledge, ceremonies and rituals, structure and propagation or recruitment. (*U.S. v. Meyers, supra*, 906 F.Supp. at pp. 1502–1503.) *Friedman*, on the other hand, elected a three-part test inquiring whether the claimed belief addresses fundamental and ultimate questions, is comprehensive in nature and consists of a belief system as opposed to an isolated teaching. (*Friedman*, at p. 69.) Although Freemasonry does not identify itself as a religion and need not for purposes of RLUIPA, it plainly fosters principles and practices that resemble religious exercise under the tests articulated above.

*Mamaroneck, supra,* 386 F.3d at p. 190, fn. 4, quoting Remarks of Sen. Hatch, 146 Cong. Rec., S7776 (daily ed. July 27, 2000); see also *Greater Bible Way Temple v. Jackson* (2007) 478 Mich. 373 [733 N.W.2d 734, 746] ["Something does not become a 'religious exercise' just because it is performed by a religious institution. Because plaintiff has not shown that the building of the apartment complex constitutes an exercise in religion, the city's decision not to rezone the property cannot be said to have burdened plaintiff's 'religious exercise . . . .' "]; *Ridley Park v. Zoning Hearing Bd.* (Pa.Commw.Ct. 2007) 920 A.2d 953, 960 ["lack of a daycare only had a *de minimis* impact on the Church's opportunity to engage in fundamental religious activities to teach religious classes because . . . the Sunday school, vacation Bible school, religious workshops for members, special holiday services, counseling and coffee hour the first Sunday of each month all provided religious instruction"].)

██ Indeed, the City's 1993 restrictions, which permitted the Cathedral to continue to operate within its historical vision and existing rights, resulted in SRCALA's decision to close the Cathedral not because of any animus toward its form of religious exercise but because the Cathedral was no longer financially viable limited to use as a nonprofit Masonic lodge and could not survive without being marketed for nonconforming public auditorium uses that exacerbated parking impacts on the neighborhood. As SRCALA and LASRC readily admit, "It is clear that parking is the key to this case." But rather than suggest an improper burdening of religious exercise, this acknowledgement merely lends credibility to the City's finding the nonconforming use constituted a public nuisance. The City's ultimate revocation of SRCALA's long-standing certificate of occupancy was prompted by the utter inability of its tenant LASRC to comply with the 1993 restrictions, a failure thoroughly documented in the record. In effect, SRCALA ceded its right to operate the Cathedral to LASRC, a commercial entity with no apparent relationship to Masonic practices other than its name, which then marketed the Cathedral as a venue for all events, commercial events included. Although the record does not contain the lease between SRCALA and LASRC or any indication of the ownership or control of LASRC from which we could ascertain a closer relationship between SRCALA and LASRC, it does contain a 2004 sworn declaration from the president of SRCALA disclosing SRCALA had not conducted any Masonic functions at the Cathedral since 1993 and had no intentions of doing so in the future.[11] Having ceded its use

---

[11] In a telling declaration dated January 23, 2004, filed in opposition to a motion for preliminary injunction brought by local homeowners, the longtime president of SRCALA, Melville Nahin, asserted SRCALA had not conducted any operations at the Cathedral since 1993 and had no intentions of doing so in the future. Mr. Nahin also stated SRCALA had entered into a long-term lease with LASRC in January 2002 and had not been in possession of the Cathedral since that date.

of the Cathedral to LASRC, SRCALA cannot establish the City's actions have had any effect on the religious exercise of its members.

### 5. *None of SRCALA and LASRC's Remaining Claims Requires Reversal of the Superior Court's Judgment*

In light of our determination SRCALA's right of religious exercise under RLUIPA was not burdened by the revocation of the certificate of occupancy, we need not consider whether RLUIPA invalidates the City's 2004 action reaffirming and modifying the conditions imposed on the operation of the Cathedral in 1993. Likewise, SRCALA and LASRC allege the City's revocation of the Cathedral's certificate of occupancy violated their First Amendment right to free exercise of religion, but, in light of our conclusion that whatever rights of religious exercise held by SRCALA did not confer protection on LASRC, the Cathedral's operator, we need not reach the constitutional claim.

SRCALA and LASRC's final claim concerns the Park Mile Specific Plan, a zoning overlay ordinance adopted in 1980 to regulate development within the Wilshire district, which includes the Cathedral. SRCALA and LASRC assert the plan violates RLUIPA's "equal terms" provision (see 42 U.S.C. § 2000cc(b)(1)), which prohibits governments from barring religious land uses while permitting comparable secular uses. SRCALA and LASRC are correct that, on its face, the plan permits auditorium uses as a conditional use within areas zoned CR(PkM) (limited commercial), but expressly prohibits "[c]hurches or other religious institutions" within the same zone. While this would appear to constitute a facial violation of RLUIPA, we have found nothing in the record to suggest any action was taken against the Cathedral under the guise of the Park Mile Specific Plan; and SRCALA and LASRC have not pointed to any such action. (See generally *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27] [" 'reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment' "]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545–546 [35 Cal.Rptr.2d 574] [not role of reviewing court to act as "backup . . . counsel" for appellant].) Indeed, the City treated SRCALA and the Cathedral as a private lodge, an expressly permitted use, throughout the public nuisance enforcement proceedings. Accordingly, SRCALA and LASRC have no standing to challenge the Park Mile Specific Plan under the circumstances of this case.[12]

---

[12] Had SRCALA and LASRC filed for a conditional use permit to allow the public auditorium use and been denied due to the religious nature of their planned activities, we might perceive this claim to be viable.

## DISPOSITION

The judgment is affirmed. Each party is to bear its own costs.

Johnson, J., and Zelon, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 3, 2008, S158172. Werdegar, J., did not participate therein.