Filed 9/30/13  In re M.H. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.H., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.H.,<br><br>        Defendant and Appellant. | A137159<br><br>(Contra Costa County<br>Super. Ct. No. J1200923) |

M.H. (Father) appeals from juvenile court orders taking jurisdiction over his daughter M.H. under Welfare and Institutions Code section 300.  He contends the court erred in ruling substantial evidence supports the finding that the child had been sexually abused by a member of her household.  We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On June 7, 2012, the Contra Costa County Children and Family Services Bureau (Bureau) filed a juvenile dependency petition alleging that M.H., then five years of age, came within the juvenile court's jurisdiction pursuant to the provisions of Welfare and Institutions Code section 300, subdivision (d) (sexual abuse).[1]  The petition was

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

supported by the allegation that the girl had been sexually abused while in Father's custody.[2] In further support of the allegation, the Bureau also stated that the child had tested positive for the sexually transmitted disease gonorrhea.

The case came to the Bureau's attention on June 5, 2012, when it was reported that M.H.'s maternal grandmother had taken the child to a pediatrician on June 1, 2012 due to a vaginal discharge and an abscess on her buttock. The doctor took various specimens for testing. On June 5, 2012, the lab results showed the child tested positive for gonorrhea and a staph infection. Per the doctor, the results confirmed sexual abuse. Reportedly, M.H. had stated that she slept in the bed with one of her teenage uncles, K.S., while at Father's home.[3]

During the initial investigation, Father and the paternal grandmother did not seem to understand that gonorrhea is a sexually transmitted disease and that M.H. had been sexually abused. The paternal grandmother believed the infection occurred because the child "wipes wrong and she scratches herself." She also stated that she had spoken with K.S., who is her son, and he explained that he had given the girl a bath because she had urinated on herself. During an exam conducted by a sexual assault specialist, the child disclosed that K.S. had put her panties on the ground, kissed her on the lips, made her hold his penis, and rubbed her vagina and butt with his fingers. She also stated that it really hurt badly when he rubbed her butt. The child was taken into protective custody and placed in a foster home.

On June 8, 2012, the juvenile court ordered M.H. detained in a nonrelative placement. Father was referred to parenting and sexual abuse education services. The court ordered that K.S. have no contact with the child.[4] Father was granted supervised visitation at a minimum of one hour, two times per month.

---

[2] M.H.'s mother was murdered in August 2011 in a shooting in Oakland.

[3] K.S. is Father's younger half-brother.

[4] K.S. subsequently tested positive for gonorrhea.

A contested jurisdictional hearing was held on September 4th, 6th, 25th, and 26th, 2012. During the hearing, the court heard testimony from the maternal grandmother, the paternal grandmother, Father, and the Bureau's social worker.

The maternal grandmother testified that M.H. had stayed at her home at least four days a week during the last school year, beginning in September 2011. The child would also spend time with the paternal grandmother, including occasions during the months of April and May in 2012. The maternal grandmother knew this because sometimes she would drop the child off with Father, and learn from him later that the child was with the paternal grandmother. On June 1, 2012, M.H. volunteered to the maternal grandmother that K.S. had put his hands in between her legs. M.H. stated she had already told the paternal grandmother that K.S. had been "messing with" her, but she had not done anything about it. The maternal grandmother took M.H. to the pediatrician, and M.H. repeated the story to the doctor. A few days later, she learned from the doctor that M.H. was infected with gonorrhea.

M.H.'s paternal grandmother testified that K.S. was living in her home when M.H would come to visit. When the child spent the night at her house, she would often sleep in the same bed as K.S. These overnight visits occurred less than once a month. Overall, she would see M.H. about five or six times a month. For about a year after M.H. was born, Father, the child's mother, and M.H. had all lived at her house, along with K.S. and the paternal grandmother's other children. She never observed anything in K.S.'s behavior towards M.H. that caused her concern. M.H. had often stated that K.S. was her favorite uncle. When the paternal grandmother asked M.H. if any man besides her father had ever touched her for bathing, she said, "Granny, [K.S.] bathed me down there."

Father testified that he went to the doctor's office on June 1, 2012 after the maternal grandmother called him from there. He spoke with his daughter and she told him that K.S. had fondled her. He has never talked to K.S. about what she said he did to her. He had been told that K.S. had given her baths, but did not know that M.H. slept in his brother's bed. The girl never said that she was uncomfortable with anyone, and he never noticed any behavior or physical symptoms suggesting that she had been touched

3

inappropriately. M.H. has her own room at Father's apartment and she would spend the night there when she was with him. She stayed with the maternal grandmother during the week because he did not have a car and she was both willing and able to transport the child to school.

On September 26, 2012, the juvenile court denied Father's motion to have the section 300, subdivision (d), allegations dismissed. The juvenile court found jurisdiction under that subdivision, concluding that the perpetrator, K.S., was a member of the child's household.

A contested dispositional hearing was held beginning on October 22, 2012. At the conclusion of the hearing, the juvenile court declared M.H. a dependent and ordered her removed from Father's custody pending the provision of family reunification services to him. This appeal followed.

## DISCUSSION

For purposes of the present appeal, Father does not dispute that the alleged molestation occurred. Instead, he contends there was insufficient evidence that K.S. was a member of the child's household within the meaning of section 300, subdivision (d). If Father is correct on that point, there would be no factual basis for sustaining the jurisdictional allegations made by the Bureau as to M.H., and no basis for the dispositional order that followed from them.

Ordinarily we review the juvenile court's jurisdiction findings for substantial evidence. (*In re David M.* (2005) 134 Cal.App.4th 822, 828; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) However, the proper interpretation of a statute and the application of the statute to undisputed facts are questions of law, which we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *Scottish Rite Cathedral Assn. of Los Angeles v. City of Los Angeles* (2007) 156 Cal.App.4th 108, 115.) Father insists that we must review this matter under the de novo standard because the issue here concerns statutory interpretation, specifically, whether the phrase "member of [the child's] household" includes someone who, in his view, did not

actually live in the same home as the child. Under either standard of review, we conclude the juvenile court's decision must be affirmed.

Section 300, subdivision (d), provides a child may be adjudged a dependent if "[t]he child has been sexually abused, or there is substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code,[5] by his or her parent or guardian *or a member of his or her household,* or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."[6] (Italics added.) The applicable definition of "member of [the child's] household" is found in the California Rules of Court: " 'Member of the household,' for purposes of section 300 proceedings, means *any person continually or frequently found in the same household as the child.*" (Cal. Rules of Court, rule 5.502(20), italics added.) This was the definition utilized by the juvenile court.

Father contends "there is absolutely no evidence that [K.S.] was a member of [M.H.]'s household" because K.S. was not often found in the child's home as she did not reside in the paternal grandmother's house. Instead, he claims the evidence established

---

[5] Penal Code section 11165.1 provides, in part, "As used in this article, 'sexual abuse' means sexual assault . . . as defined by the following: [¶] (a) 'Sexual assault' means conduct in violation of one or more of the following sections: Section 261 (rape), subdivision (d) of Section 261.5 (statutory rape), 264.1 (rape in concert), 285 (incest), 286 (sodomy), subdivision (a) or (b), or paragraph (1) of subdivision (c) of Section 288 (lewd or lascivious acts upon a child), 288a (oral copulation), 289 (sexual penetration), or 647.6 (child molestation). [¶] (b) Conduct described as 'sexual assault' includes, but is not limited to, all of the following: [¶] (1) Any penetration, however slight, of the vagina or anal opening of one person by the penis of another person, whether or not there is the emission of semen. [¶] (2) Any sexual contact between the genitals or anal opening of one person and the mouth or tongue of another person. [¶] (3) Any intrusion by one person into the genitals or anal opening of another person, including the use of any object for this purpose, except that, it does not include acts performed for a valid medical purpose. [¶] (4) The intentional touching of the genitals or intimate parts (including the breasts, genital area, groin, inner thighs, and buttocks) or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification, except that, it does not include acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose. [¶] (5) The intentional masturbation of the perpetrator's genitals in the presence of a child. . . ."

[6] In the present case, it was not alleged that Father knew or should have known of the danger that his child would be sexually abused.

5

that M.H. lived with her maternal grandmother (during the week) and with him (on the weekends). At most, she would stay overnight at the paternal grandmother's home once a month. Thus, he contends K.S. was not a member of M.H.'s household "by any stretch of the imagination." We are not persuaded.

Resolving all factual conflicts in favor of the Bureau, the evidence adduced in the juvenile court shows that K.S. was "continually or frequently" found in the same household as M.H. He lived with the paternal grandmother full time, supporting the inference that he was present *every time* M.H. spent the night in her paternal grandmother's home. It is true that the overnight visits, and thus the opportunities for K.S. to engage in molesting his niece, were limited. However, the paternal grandmother testified that she spent time with the child five or six times each month, and there is no indication that these visits occurred away from her home or separate from Father's extended family. Thus, it is reasonable to infer that M.H. was compelled to be in the presence of her abuser far more often than just once a month. We find it reasonable to deem this level of interaction both "continuous" and "frequent."

We also concur with the juvenile court's assessment of M.H.'s peripatetic living situation. The child was being raised with the aid of her extended family, with the paternal grandmother's home serving as one of the three households in which the child was housed and cared for. It was also established that the child had continually lived in this home for a full year after she was born. Given the definition of "member of the household" specifically required by juvenile court rule for determinations under section 300, we conclude the court did not err in sustaining the Bureau's allegation.

While Father resorts to various dictionary definitions of terms such as "member," "household," and "dwelling," we agree with the Bureau that the more inclusive definition of household member found in the Rules of Court is consistent with the statutory purpose of ensuring the maximum protection of children who have been abused. Persons frequently in the home, such as continuous residents, have unique access to the children who stay there and occupy positions of trust within the family that may permit abuse to persist even after it comes to light. Significantly, both Father and the paternal

6

grandmother initially minimized the situation by suggesting that K.S. had merely bathed the child, and, in the paternal grandmother's case, attributing the infection to M.H.'s own poor hygiene practices. This family dynamic presents the kind of danger to M.H. that section 300, subdivision (d), was intended to prevent.

## DISPOSITION

The juvenile court's jurisdictional and dispositional findings and orders are affirmed.

_____
Dondero, Acting P.J.

We concur:

_____
Banke, J.

_____
Sepulveda, J.*

* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.