PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-2574

_____

SHARONELL FULTON; CECELIA PAUL;
TONI LYNN SIMMS-BUSCH;
CATHOLIC SOCIAL SERVICES,

Appellants

v.

CITY OF PHILADELPHIA; DEPARTMENT OF
HUMAN SERVICES FOR THE CITY OF
PHILADELPHIA; PHILADELPHIA COMMISSION
ON HUMAN RELATIONS

SUPPORT CENTER FOR CHILD ADVOCATES;
PHILADELPHIA FAMILY PRIDE
(Intervenors in D.C.)

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-18-cv-02075)
District Judge: Honorable Petrese B. Tucker

_____

Argued November 6, 2018

Before: AMBRO, SCIRICA, and RENDELL, <u>Circuit Judges</u>

(Opinion filed: April 22, 2019)

Stephanie H. Barclay
Nicholas R. Reaves
Mark L. Rienzi
Lori H. Windham (Argued)
Becket Fund for Religious Liberty
1200 New Hampshire Avenue, N.W., Suite 700
Washington, DC   20036

Nicholas M. Centrella
Conrad O'Brien
1500 Market Street
West Towers, Suite 3900
Philadelphia, PA  19102

   Counsel for Appellants

Marcel S. Pratt
City Solicitor
Diana Cortes
Chair, Litigation Group
Jane Lovitch Istvan (Argued)
Chief Deputy Solicitor, Appeals
Eleanor N. Ewing
Chief Deputy City Solicitor
Affirmative & General Litigation
Elise M. Bruhl
Benjamin H. Field

Schaundra Oliver
Michael W. Pfautz
City of Philadelphia, Law Department 17th Floor
1515 Arch Street
Philadelphia, PA   19102

      Counsel for Appellees

David J. Hacker
Office of Attorney General of Texas
Office of Special Litigation
P.O. Box 12548
Austin, TX  78711

      Counsel for Amicus Appellants
      State of Missouri, State of Nebraska,
      State of Oklahoma,  State of Alabama,
      State of Arkansas, State of Louisiana,
      State of Texas, Commonwealth of Kentucky

John J. Bursch
Bursch Law
9339 Cherry Valley Southeast, Suite 78
Caledonia, MI   49316

David A. Cortman
Rory T. Gray
John M. Sharp
Kristen K. Waggoner
Alliance Defending Freedom
1000 Hurricane Shoals Road, N.E.
Building D, Suite 1100
Lawrenceville, GA   30043

Counsel for Amicus Appellants
Alliance Defending Freedom, Ethics and Religious
Liberty Commission of the Southern Baptist
Convention, Family Research Council, Focus on the
Family

William Haun
Shearman & Sterling
401 9th Street, N.W., Suite 800
Washington, DC   20004

Counsel for Amicus Appellant
Jewish Coalition for Religious Liberty

Miles Coleman
Nelson Mullins Riley & Scarborough
104 South Main Street, Suite 900
Greenville, SC   29601

Counsel for Amicus Appellants
Mike Enzi, Roy Blunt, John Boozman,
Tom Cotton, Ted Cruz, Steve Daines, Tim Scott,
James M. Inhofe, James Lankford, James E. Risch,
Mike Kelly, Robert Aderholt, Jim Banks, Lou Barletta,
Diane Black, Kevin Brady, Kevin Cramer,
Jeff Duncan, Neal P. Dunn, Matt Gaetz,
Glenn Grothman, Andy Harris, Jody B. Hice,
Randy Hultgren, Walter B. Jones, Steve King,
Doug Lamborn, Billy Long, Barry Loudermilk,
Tom Marino, Mark Meadows, Ralph Norman,
Pete Olson, John Ratcliffe, Dana Rohrabacher,
Todd Rokita, Keith Rothfus, Steve Russell,

4

Steve Scalise, Christopher Smith,
Randy K. Weber, Roger Williams

Andres M. Picciotti-Bayer
Catholic Association Foundation
3220 N Street, N.W., Suite 126
Washington, DC   20007

    Counsel for Amicus Appellants
    Former Foster Children & Foster Parents;
    Catholic Association Foundation

Leslie Cooper (Argued)
James D. Esseks
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY   10004

Fred T. Magaziner
Catherine V. Wigglesworth
Dechert
2929 Arch Street, Cira Center 18th Floor
Philadelphia, PA   19104

Mary Catherine Roper
Molly M. Tack-Hooper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA   19106

    Counsel for Intervenor-Appellees
    Philadelphia Family Pride, Support Center for
    Child Advocates

Alexander J. Luchenitser
Richard B. Katskee
Americans United for Separation of Church & State
1310 L Street, NW, Suite 200
Washington, DC   20005

       Counsel for Amicus Appellee Americans United for
       Separation of Church & State

Steven M. Freeman
David L. Barkey
Melissa Garlick
Amy E. Feinman
Anti-Defamation League
605 Third Avenue
New York, NY   10158

M. Duncan Grant
Alexander L. Harris
Pepper Hamilton
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

       Counsel for Amicus Appellees
       Anti-Defamation League of Philadelphia,
       Asian Pacific American Advocates,
       Bend the Arc a Jewish Partnership for Justice,
       Hindu American Foundation,
       Interfaith Alliance Foundation, Japanese American
       Citizens League, Jewish Social Policy Action
       Network, Jewish Women International, Keshet,

Muslim Advocates, National Council of Jewish Women, People for the American Way Foundation, Sikh Coalition, South Asian Americans Leading Together, Rabbinic Call for Human Rights

Julie Wilensky
Shannon P. Minter
Catherine Sakimura
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA   94102

Counsel for Amicus Appellees
National Center for Lesbian Rights, Civil Rights Education and Enforcement Center, Disability Rights Advocates, Disability Rights Education and Defense Fund Inc., Equal Justice Society, GLBTQ Legal Advocates and Defenders, Legal Aid at Work, Impact Fund, National Association of the Deaf, National Federation of the Blind, Transgender Law Center

Cathren I. Cohen
Marshall Currey Cook
Karen Loewy
Lambda Legal
120 Wall Street, 19th Floor
New York, NY   10005

Counsel for Amicus Appellees
Fosterclub, Garden State Equality, Gender and Sexuality Development Clinic of Children's Hospital of Philadelphia, Human Rights Campaign,

Lambda Legal Defense & Education Fund Inc.,
Mazzoni Center, National LGBTQ Task Force,
Pennsylvania Youth Congress Foundation,
The Trevor Project, True Colors Fund

Maura Healey
Attorney General of the Commonwealth of Massachusetts
Elizabeth N. Dewar
State Solicitor
Abigail B. Taylor
Angela R. Brooks
Genevieve C. Nadeau
Office of Attorney General of Massachusetts
One Ashburton Place, McCormack Building 20th Floor
Boston, MA   02108

Counsel for Amicus Appellees
State of California, State of Connecticut, State of
Delaware, District of Columbia, State of Hawaii, State
of Illinois, State of Iowa, State of Maine, State of
Maryland, State of Minnesota, State of New Jersey,
State of New York,  State of Oregon, Commonwealth
of Pennsylvania, State of Rhode Island, State of
Vermont, State of Washington, Commonwealth of
Massachusetts

Jeffrey S. Trachtman
Norman C. Simon
Tobias B. Jacoby
Jason M. Moff
Elise Funke
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americans

New York, NY   10036

Counsel for Amicus Appellees
Rev. Lavonne Althouse, Dr. Kharma Amos,
Rev. Robert Burke, Dr. Randy Bush,
Central Atlantic Conference of United Church of
Christ, Central Atlantic Conference of American
Rabbis, Covenant Network of Presbyterians,
Dr. Beverly Dale, Dr. Janet Edwards, Rev. Jean Erb,
Evangelical Lutheran Church in American,
Rev. Margaret Diane Fisher, Friends for Lesbian Gay
Bisexual Transgender and Queer Concerns;
Rev. Phillip Geliebter, Rev. Michael Giansiracusa,
Rev. Hilary Greer, Rev. Sara Hale, Erin Hirsh,
Melford Holldand, Rev. Rebecca Irwin-Diehl,
Dr. Elizabeth Kaeton, Rev. Catherin Kerr,
Mary Kisner, Dr. Vincent Kolb, Lutherans for Full
Participation; Men of Reform Judaism, Rev. Jeffrey
Miller, More Light Presbyterians, Muslims for
Progressive Values, Rev. Bill Neely, Linda Noonan,
Penn Central Conference of United Church of Christ,
Penn Northeast Conference of the United Church of
Christ, Penn West Conference of United Church of
Chris, Pennsylvania Southeast Conference of United
Church of Christ, David Pickett, Rev. William
Podobinski, Reconciling Works, Reconstructionist
Rabbinical Association, Religious Institute, Serena
Rice, Rev. Michael Ruk, Michele Schenk,
Rev. Matthew Simpson, Stated Clerk of the General
Assembly of Presbyterian Church, Megan Sutker,
Stephanie Anne Thompson, Union for Reform
Judaism, Unitarian Universalist Association,
Rev. Naomi Washington-Leapheart, Amy Welin,
Dr. Traci West, Women of Reform Judaism,

9

Rev. Joan Wylie

Justin Goodyear
Wilmer Cutler Pickering Hale and Dorr
7 World Trade Center
250 Greewich Street
New York, NY   10007

Elizabeth Mitchell
Emily L. Stark
Lauren J. Schreur
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania Avenue, N.W.
Washington, DC   20006

> Counsel for Amicus Appellees
> Child Welfare League, National Association of Social
> Workers, North American Council of Adoptable
> Children, Voice for Adoption

Joshua A. Matz
Kaplan Hecker & Fink
350 Fifth Avenue, Suite 7110
New York, NY 10118

> Counsel for Amicus Appellees
> Caroline Mala Corbin, Frederick Gedicks,
> Richard C. Shragger, Micah Schwartzman,
> Elizabeth Sepper, Nelson Tebbe

Kendyl T. Hanks
Greenberg Traurig
300 West 6th Street, Suite 2050

Austin, TX 78701

Counsel for Amicus Appellees
Children's Rights, Barton Child Law & Policy Center,
Emory Law School, Center for Children & Youth
Justice, Center for Children's Advocacy, Center for
the Study of Social Policy, Center on Children and
Families, Children and Family Justice Center,
Children's Action Alliance, Children's Advocacy
Institute, Children's Defense Fund-New York,
Children's Law Center of California, Children's Law
Center of Kentucky, Children's Law Center of
Minnesota, Coalition for Juvenile Justice,
Columbia Legal Services; First Star, Inc., Florida's
Children First, Inc., Harvard Law School Child
Advocacy Program, Juvenile Law Center,
Lawyers For Children, Legal Counsel for Youth and
Children, Legal Services for Children, Professor Bruce
A. Boyer, Professor Michael J. Dale, National Center
for Youth Law, Nebraska Appleseed, New Mexico
Child Advocacy Network, Partners for Our Children,
Pegasus Legal Services for Children,
Rutgers School of Law Children's Justice Clinic,
University of Miami Children & Youth Law Clinic,
Youth Law Center

Philip E. Karmel
Bryan Cave Leighton Paisner
1290 Avenue of the Americas
New York, NY 10104

Counsel for Amicus Appellees
Family Equality Council, COLAGE

11

## OPINION OF THE COURT

AMBRO, <u>Circuit Judge</u>

A reporter from the *Philadelphia Inquirer* informed the City of Philadelphia's Department of Human Services in March 2018 that two of its agencies would not work with same-sex couples as foster parents. Human Services investigated this allegation, which it considered a violation of the City's anti-discrimination laws. When the agencies confirmed that, because of their religious views on marriage, they would not work with gay couples, Human Services ceased referring foster children to them. One of those agencies, Catholic Social Services (sometimes abbreviated to "CSS"), brought this action claiming that the City has violated its rights under the First Amendment's Free Exercise, Establishment, and Free Speech Clauses, as well as under Pennsylvania's Religious Freedom Protection Act. It seeks an order requiring the City to renew their contractual relationship while permitting it to turn away same-sex couples who wish to be foster parents. CSS sought preliminary injunctive relief to this effect from the District Court. When it denied the request after a three-day hearing, *Fulton v. City of Philadelphia*, 320 F. Supp. 3d. 661 (E.D. Pa. 2018), CSS appealed.

Our question is not whether the City or CSS has behaved reasonably. Nor is our task to mediate a mutually agreeable compromise between the parties.[1] It is to determine

---

[1] That being said, District Judge Tucker commented that she "would prefer that the [p]arties seek . . . some compromise to

12

whether the City's actions were lawful. Did it have the authority to insist, consistent with the First Amendment and Pennsylvania law,that CSS not discriminate against same-sex couples as a condition of working with it to provide foster care services? Or, inversely, has CSS demonstrated that the City transgressed fundamental guarantees of religious liberty?

At this stage and on this record, we conclude that CSS is not entitled to a preliminary injunction. The City's non-discrimination policy is a neutral, generally applicable law, and the religious views of CSS do not entitle it to an exception from that policy. *See Emp't Div. v. Smith*, 494 U.S. 872, 877-78 (1990). It has failed to make a persuasive showing that the City targeted it for its religious beliefs, or is motivated by ill will against its religion, rather than sincere opposition to discrimination on the basis of sexual orientation. Thus we affirm.

### I. Background

Catholic Social Services is a religious non-profit organization affiliated with the Archdiocese of Philadelphia that provides foster care services in Philadelphia. Created in 1917 as the Catholic Children's Bureau, it is part of a tradition of caring for children in need that stretches back even further, to the yellow fever outbreak of 1797. As an affiliate of the Catholic Church, CSS sees caring for vulnerable children as a core value of the Christian faith and therefore views its foster care work as part of its religious mission and ministry. When the Catholic Children's Bureau was founded, foster care was handled on a private basis, but over the following century that changed. Today that care is comprehensively regulated both

their current dispute without court intervention." *Id*. at 667. We agree, especially given the long and constructive relationship between the parties.

13

by the Commonwealth of Pennsylvania and by the City of Philadelphia.

The Commonwealth, the City, and the private foster care agencies each play a role in the Philadelphia foster care system. State regulations set the criteria people or families must meet to become foster parents, as well as the duties of both foster parents and foster care agencies. *See* 55 Pa. Code § 3700.62 *et seq.* Those agencies then develop relationships with individual foster families, which begin when a family approaches an agency seeking to become foster parents. It must evaluate the applicants under the Commonwealth's criteria to determine whether they would be suitable candidates. *See* 23 Pa. Cons. Stat. § 6344(d); 55 Pa. Code § 3700.64. One criterion concerns the "[e]xisting family relationships, attitudes and expectations regarding the applicant's own children and parent/child relationship, especially as they might affect a foster child." 23 Pa. Cons. Stat. § 6344(d)(2)(iv); 55 Pa. Code § 3700.64(b)(1).

When a child in need of foster care comes into the City's custody, Human Services refers that child to one of the foster care agencies with which it has a contractual relationship. Once the City refers a child to an agency, that agency selects an appropriate foster parent for the child, although Human Services can oppose a child's placement with a particular foster parent if necessary.

At the outset of this litigation, the City of Philadelphia had contracts with 30 foster care agencies, including CSS. These are one-year contracts renewed on an annual basis. Agencies are compensated by the City for their services; CSS's contract provided for a *per diem* rate for each child placed in one of its affiliated foster homes. This payment did not cover its full expenses, meaning that CSS operated at a loss. The contract required it to certify its foster parents in accord with

14

state regulations, but did not otherwise impose conditions on the certification process. It did, however, include language prohibiting CSS from discriminating due to race, color, religion, or national origin, and it incorporated the City's Fair Practices Ordinance, which in part prohibits sexual orientation discrimination in public accommodations.

This last requirement, and the parties' differing understandings of it, led to this controversy. CSS takes the position that it cannot certify a same-sex married couple as foster parents consistent with its religious views. As an affiliate of the Catholic Church, CSS adheres to the belief that marriage is between a man and a woman. It is not unwilling to work with LGBTQ individuals as foster parents. However, state regulations require it to consider an applicant's "existing family relationships" as part of the certification process. In applying this criterion, CSS will only certify foster parents who are either married or single; it will not certify cohabitating unmarried couples, and it considers all same-sex couples to be unmarried. So far as the record reflects, no same-sex couples have approached CSS seeking to become foster parents.

On March 9, 2018, a reporter from the *Philadelphia Inquirer* called Human Services and stated that two of the City's foster care agencies, CSS and Bethany Christian Services, would not work with same-sex couples as foster parents. The *Inquirer* published an article to this effect on March 13, 2018. In response, the Commissioner of Human Services, Cynthia Figueroa, called officials at both CSS and Bethany Christian asking if this report was true. Both organizations confirmed the report. James Amato, the Secretary of CSS, told Commissioner Figueroa that his agency would not certify same-sex couples because it was against the Church's views on marriage and, when told this was discrimination, replied that he was merely following the teachings of the Catholic Church. Commissioner Figueroa

15

then called a number of other foster care agencies asking whether they had similar policies; none did. All but one of the other agencies Figueroa called were religiously affiliated. As for the one secular agency, she testified that she had a "good relationship" with its CEO.

Shortly thereafter, Amato attended a meeting with Figueroa in an unsuccessful attempt to resolve the impasse. At this meeting, Amato invoked CSS's hundred-year history of providing services to the City. Figueroa responded by noting that times had changed over the course of that relationship, that women and African-Americans did not have the same rights when it started, and that she herself would likely not have been in her position a century earlier. Figueroa, who is Catholic and Jesuit-educated, also remarked to Amato that it would be great if CSS could follow the teachings of Pope Francis. Amato later testified that Figueroa specifically stated that CSS should follow Pope Francis as opposed to the Archdiocese of Philadelphia or its Archbishop Charles J. Chaput; Figueroa denied mentioning anyone other than Pope Francis. Figueroa also indicated to Amato that the matter had the attention of the highest levels of City government, by which she testified she meant herself, her chain of command, and ultimately Mayor James Kenney. She also testified that prior to this meeting she spoke briefly with the Mayor; she told him that she was working to address the issue and would brief him after more decisions had been made.

Immediately after his meeting with Figueroa, Amato received a phone call from a representative of Human Services who informed him that it would no longer refer new foster children to CSS, a policy known as an "intake freeze."[2]

_____

[2] This intake freeze also affected Bethany Christian, although, as noted below, Bethany has since worked out an agreement with the City and has resumed receiving foster care referrals.

16

Figueroa testified that she implemented the freeze because of her serious concern that CSS's relationship with Human Services might end in the near future. Given the preference for stability in placing foster care children, she did not want to send any new children to an agency they might well have to leave in a matter of months. This was not the first time Human Services had instituted an intake freeze out of a concern that it might not be able to continue working with a given agency. The freeze nonetheless did not affect children already placed with CSS.

Nor did it affect other aspects of CSS's relationship with the City. Family foster care is only one component of Philadelphia's framework for at-risk children. The City also employs private agencies to operate "congregate care" facilities, or group homes, for children in state custody who have not been assigned to a foster family for one reason or another. And it partners with "Community Umbrella Agencies" that work with children in the community to address problems in their home environment that might prevent them from remaining at home. CSS operates as a congregate care provider and a Community Umbrella Agency, and its services in those capacities were not affected by the intake freeze or any subsequent developments in this dispute pertaining to foster care. Indeed, in each unrelated area it continues working with the City to this day.

On several occasions Human Services granted exceptions to the intake freeze where there were particularly strong reasons why CSS would be the best placement for an individual child—for example, if one of that child's siblings had already been placed with a CSS family. It does not appear that any exemption requests were denied.

Meanwhile, on March 15, 2018, two days after the *Inquirer* article, the City Council passed a resolution authorizing the Philadelphia Commission on Human Relations

to "investigate Department of Human Services' policies on contracting with social services agencies that . . . discriminate against prospective LGBTQ foster parents." The resolution stated that "the City of Philadelphia has laws in place to protect its people from discrimination that occurs under the guise of religious freedom," and declared that any "agency which violates City contract rules in addition to the Fair Practices Ordinance should have their contract with the City terminated with all deliberate speed." The following day (March 16), lawyers for the Commission wrote to CSS with a battery of questions regarding its policies about working with same-sex couples or LGBTQ individuals. It responded on April 16, 2018, challenging both the legal basis for what it termed the "City's unlawful suspension" of its contract and the Commission's jurisdiction over the matter. Centrally, CSS argued that its screening of would-be foster parents was not a public accommodation and hence not subject to the Fair Practices Ordinance.

Lawyers from the City wrote back separately on the jurisdictional and substantive points on May 7, 2018. As to substance, the City asserted that its contract with CSS had not been formally suspended, and that it did not require any referrals to that agency. Therefore the City could not possibly have breached the contract by suspending referrals. The letter noted several provisions of the contract that, it argued, forbade CSS's policy of discrimination.

After setting out the City's legal interpretation of the contract, the letter stated its plan going forward:

> Please also note that CSS's current contract expires on June 30, 2018, and the City is under no legal obligation to enter into a new contract for any period thereafter. We are hopeful that we can work out any differences before then, but

18

please be advised that—except where the best interests of a child demands otherwise—the City does not plan to agree to any further referrals to CSS, and the City intends to assist with the transition of foster families to other agencies, absent assurances that CSS is prepared to adhere to its contractual obligations and, in implementing its City contract, to comply with all applicable laws, including those related to non-discrimination. We believe our current contract with CSS is quite clear that this is our right, but please be advised that any further contracts with CSS will be explicit in this regard.

The letter underscored "respect [for CSS's] sincere religious beliefs, but your freedom to express them is not at issue here where you have chosen voluntarily to partner with us in providing government-funded, secular social services." It stressed the importance of equality as "both a legal requirement, and an important City policy and value that must be embodied in our contractual relationships." In addition, the City reaffirmed that it did not want to see its "valuable relationship with CSS . . . come to an end," but instead hoped that CSS would agree to comply going forward with the terms of the Fair Practices Ordinance.

As to jurisdiction, the City further asserted that foster care is a public accommodation, triggering both the Ordinance's mandate and the Commission's jurisdiction. The City requested a response to the questions in its March 16 letter within 10 days and threatened subpoenas if CSS did not comply. The latter responded by filing this lawsuit, alleging 16 causes of action against the City, Human Services, and the Human Relations Commission. Three individuals who had worked with CSS as foster parents—Sharonell Fulton, Cecilia

19

Paul,[3] and Toni Lynn Simms-Busch—were also listed as plaintiffs.[4]  On June 5, 2018, plaintiffs moved for a temporary restraining order and preliminary injunction.  Their proposed order would have required the City to "resume providing foster care referrals to [CSS] and permitting children to be placed

---

[3] Ms. Paul died during the pendency of this action.  She fostered children for over 40 years, taking into her home more than 100 children, and personally adopting six.  In 2015, the City of Philadelphia recognized her as the "Outstanding Foster Parent of the Year."  Thomas Paul, adopted son of Ms. Paul, "believes he was raised by a living saint."  Brief of *Amici Curiae* Former Foster Children and Foster Parents and the Catholic Association Foundation at 4.

[4] We have doubts whether the individual plaintiffs have standing to bring this complaint, as the City took no direct action against them.  Any harms to the individual plaintiffs were the consequence of the City's actions against CSS.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (party seeking to assert the rights of others must show (1) a "close" relationship with the one who possesses the right, and (2) some "hindrance" to the possessor's ability to assert its own rights).  But the issue of standing was not raised, and the limits on third-party standing are not a matter of our constitutional jurisdiction under Article III but rather "stem from a salutary 'rule of self-restraint.'"  *Craig v. Boren*, 429 U.S. 190, 193 (1976) (*quoting Barrows v. Jackson*, 346 U.S. 249, 255 (1953)).  In any event, the individual plaintiffs claim only that the City violated the Constitution by taking action against CSS.  Hence we may safely analyze this case solely in terms of whether CSS's rights have been violated.

with the foster families it has certified without delay," to "rescind its prior directive prohibiting any foster care referrals to [CSS,] . . . to resume all dealings with [it] on the same terms as they had proceeded prior to March 2018," and also to "resume and to continue operating under the current Contract, without breach, termination, or expiration, or to enter into a new Contract identical in all material respects to the current Contract, while this matter remains pending."  Doc. #13-1 to *Fulton et al. v. City of Philadelphia et al.*, No. 2:18-cv-02075-PBT (E.D. Pa. 2018).  (As noted below, that contractual arrangement has lapsed in any event.)

The District Court promptly held a hearing on plaintiffs' motion for preliminary injunctive relief.  The hearing, which spanned three days, included testimony from plaintiffs Simms-Busch, Paul, and Fulton, as well as from Amato,[5] Deputy Commissioner of Human Services Kimberly Ali, Commissioner Figueroa, and Frank Cervone, a child advocate

---

[5] At the hearing, Amato mentioned a CSS policy of which the City had been previously unaware, namely that CSS required would-be foster parents to submit a so-called "pastoral letter" from a religious figure (of any faith or denomination) certifying that they were actively religious, regularly attended services, *etc*.  The City took issue with this policy, arguing that it violated both CSS's contract with the City and the Establishment Clause of the First Amendment to the federal Constitution.  CSS then informed the Court that, while it did not believe the "pastoral letter" requirement violated any applicable laws, it would abandon that requirement going forward "in order to eliminate any potential issue regarding how the parties would operate under a preliminary injunction."

21

who testified as an expert witness.[6]  (It was after this hearing that lawyers for the City informed the Court that it had resumed foster care operations with Bethany Christian when the latter agreed to cease discriminating against same-sex couples.)

The District Court denied the application for preliminary injunctive relief in a memorandum opinion, and plaintiffs appealed the same day.  They argue to us that the District Court wrongly held that they were not likely to succeed on the merits of their Free Exercise, Establishment Clause, and Freedom-of-Speech claims, as well as under the Pennsylvania Religious Freedom Protection Act.  Plaintiffs asked the District Court for injunctive relief pending appeal the following day, which it denied.

Plaintiffs—now appellants—also sought from our Court emergency injunctive relief pending appeal under Federal Rule of Appellate Procedure 8.  We denied the motion by order.

Finally, appellants filed an emergency application to the Supreme Court for an injunction pending appeal or an immediate grant of *certiorari*.  Justice Alito referred the application to the full Court, which denied it.  *Fulton v. City of Philadelphia*, No. 18A-118, 2018 WL 4139298 (U.S. Aug. 30, 2018).

## II. Jurisdiction and Standard of Review

---

[6] Plaintiffs contested the propriety of Cervone's testimony, as he had signed legal papers in the case on behalf of the Center for Child Advocates, an organization seeking to intervene in the case (ultimately successfully), and Cervone had not yet withdrawn that appearance. In any event his testimony is not important to the issues on appeal.

The District Court had jurisdiction under 28 U.S.C. § 1331. Our jurisdiction to review the District Court's denial of a preliminary injunction stems from 28 U.S.C. § 1292(a)(1).

Ordinarily, when reviewing a district court's ruling on a motion for preliminary injunctive relief, we review findings of fact for clear error, conclusions of law *de novo*, and the ultimate decision to grant or deny preliminary relief for abuse of discretion. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). Because this case implicates First Amendment interests, however, we do not rely on the normal clear-error standard for factual review, but instead conduct an independent examination of the record as a whole. *Brown v. City of Pittsburgh*, 586 F.3d 263, 268–69 (3d Cir. 2009). Thus we defer to the District Court's factual findings only insofar as they concern witness credibility. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 156–57 (3d Cir. 2002).

When evaluating a motion for preliminary injunctive relief, a court considers four factors: (1) has the moving party established a reasonable likelihood of success on the merits (which need not be more likely than not); (2) is the movant more likely than not to suffer irreparable harm in the absence of preliminary relief; (3) does the balance of equities tip in its favor; and (4) is an injunction in the public interest? *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Reilly*, 858 F.3d at 179. If a plaintiff meets the first two requirements, the District Court determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought. *Id.*

### III. Discussion

### A. The Free Exercise Clause

CSS principally contends that the City's actions violated its rights under the Free Exercise Clause. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This prohibition applies to the States through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Per *Employment Division v. Smith*, 494 U.S. 872, 877 (1990), the Free Exercise Clause "means, first and foremost, the right to believe and profess whatever religious doctrine one desires."

> Thus, the First Amendment obviously excludes all governmental regulation of religious *beliefs* as such. The government may not compel affirmation of religious belief, punish the expression of doctrines it believes to be false, impose special disabilities on the basis of religious views of religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

*Id*. (internal citations and question marks omitted) (emphasis in original). Likewise, it forbids government acts specifically designed to suppress religiously motivated practices or conduct. *Id*. at 877–78.

The Free Exercise Clause does not, however, "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id*. at 879 (*quoting United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)). As Justice Felix Frankfurter stated nearly eighty years ago, "[c]onscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the

24

promotion or restriction of religious beliefs." *Id.* at 879 (quoting *Minersville Sch. Dist. Bd. of Educ. v. Gobitis*, 310 U.S. 586, 594–95 (1940) (Frankfurter, J.)). Among other things, this means that religious or conscientious objections do not supersede the basic obligation to comply with generally applicable civil rights laws provided those laws are applied neutrally. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Com'n*, 138 S. Ct. 1719, 1727 (2018) ("Nevertheless, while . . . religious and philosophical objections [to same-sex marriage] are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."); *see also Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 694 n.24 (2010) (observing that, under *Smith*, the Free Exercise Clause did not require public law school to grant religious exemption to its "all-comers" policy forbidding discrimination by student organizations).

CSS contends that the City's enforcement of its laws and policies was neither neutral nor generally applicable. It first argues that the City's reliance on the Fair Practices Ordinance, which prohibits discrimination on the basis of sexual orientation in public accommodations, is misplaced because evaluating prospective foster parents is not a public accommodation.[7] The District Court disagreed and held that

_____

[7] CSS makes a similar argument toward what it calls the City's "must-certify" policy, which it claims was the second basis for the City's actions in addition to the Fair Practices Ordinance. CSS asserts that the City had never enforced such a policy before this dispute. The City, meanwhile, disclaims the policy's existence, and says that it was solely enforcing its

25

the Ordinance did apply to CSS. We need not address this issue, however, as the contract between CSS and the City expired on June 30, 2018. As a result, requiring the City to comply with the terms of that agreement is now moot. What remains is whether it may insist on the inclusion of new, explicit language forbidding discrimination on the ground of sexual orientation as a condition of contract renewal, or whether it must offer CSS a new contract that allows it to continue engaging in its current course of conduct.[8]

To support its claim that the City's proposed anti-discrimination clause is not permissible under *Smith*, CSS invokes cases where courts have found ostensibly neutral

---

longstanding rules against discrimination. But as noted above, because the existing contract between CSS and the City has expired, we need not address whether any "must-certify" policy was a sufficiently neutral, general rule to support the City's actions. (See below for a fuller discussion of the dispute over the "must-certify" policy as it relates to the City's motivation.)

[8] It should be noted that the remedy CSS seeks—an injunction forcing the City to renew a public services contract with a particular private party—would be highly unusual. CSS cites several affirmative action cases where courts granted equitable relief to government contractors, such as *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). But the injunctions in those cases merely forbade government entities from enforcing their express affirmative action policies going forward. *See id.* at 210. We have some doubt, therefore, that CSS could be entitled to the relief it seeks. We do not rest our decision on that ground, however, as it involves novel and complex questions of remedies law, and instead address the merits of CSS's claims.

government action unconstitutional because it was motivated by ill will toward a specific religious group or otherwise impermissibly targeted religious conduct. *See, e.g.*, *Masterpiece Cakeshop*, 138 S. Ct. 1719; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). These cases, and similar decisions by our Court, clarify *Smith* by reaffirming that the government may not conceal an impermissible attack on religion behind a cloak of neutrality and general application. Thus, a challenger under the Free Exercise Clause must show that it was treated differently *because of* its religion. Put another way, it must show that it was treated more harshly than the government would have treated someone who engaged in the same conduct but held different religious views.

The focus on different treatment of religious and secular conduct is clear in *Lukumi*, the font of this doctrine. There the City of Hialeah, Florida had adopted an ordinance prohibiting the slaughtering of animals except in certain recognized circumstances. The history of the law's adoption made plain, however, that this was no earnest piece of animal welfare legislation but rather an attempt to suppress the practice of Santeria, a fusion of traditional African religion and Catholicism that developed in Cuba in the Nineteenth Century and incorporates animal sacrifice in many of its rituals. *Lukumi,* 508 U.S. at 524. The emergency sessions that led to the ordinance, held immediately after a Santeria church first tried to open in town, were rife with unrestrained hostility. Council members referred to supposed Biblical prohibitions on animal sacrifice except for consumption and asked "What can we do to prevent the Church from opening?" *Id*. at 541. The audience cheered these remarks and taunted the president of the Church, plus the chaplain of the city police department called Santeria "an abomination to the Lord." *Id*. at 541–42.

27

Moreover, the ordinance itself, though ostensibly concerned with animal welfare, plainly reflected this hostility. Its restriction on animal killing was limited to "sacrifice," and was further limited to the context of "a public or private ritual or ceremony." *Id*. at 527. Although it did not apply if the killing was "for the primary purpose of food consumption," or if the animals were "specifically raised for food purposes," the ordinance did apply to ritual sacrifice even if the animal was eaten during the ritual, as would often happen in Santeria rituals. *Id*. at 527–28. As the Court noted, the "net result" of these definitions was that "few if any killings of animals are proscribed other than Santeria sacrifice. . . . Indeed, careful drafting ensured that, although Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other circumstances are unpunished." *Id*. at 536. This "gerrymander" of the ordinance, *id*., along with the striking hostility at the public meetings, left the Court with only "one conclusion: The ordinances had as their object the suppression of religion." *Id*. at 542.

*Masterpiece Cakeshop* featured similar demonstrations of religious animosity and differing treatment of religious conduct.[9] Denver baker Jack Phillips refused to make a cake for a gay couple's wedding reception, citing his religious conviction that marriage is only the union of a man and a woman. Phillips believed that, were he "to create a wedding cake for an event that celebrates something that directly goes against the teachings of the Bible, [it] would have been a personal endorsement and participation in the ceremony and relationship that they were entering into." *Masterpiece*

---

[9] Unlike *Lukumi*, where the impermissible hostility toward Santeria was apparent during the adoption of the animal sacrifice ordinance, in *Masterpiece* it came out in the conduct of the officials charged with executing the law.

28

*Cakeshop*, 138 S. Ct. at 1724. The couple sued under Colorado's public accommodations statute. The case was referred to the state's Civil Rights Commission, which concluded that Phillips had engaged in prohibited discrimination and that neither Phillips's religious free exercise nor his free speech rights were violated by applying this anti-discrimination law to him.

The Supreme Court ultimately reversed; while Colorado generally had the right to enforce its civil rights laws against Phillips, it was bound under the First Amendment to afford him a "neutral and respectful consideration." *Id.* at 1729. Instead, the Commission expressed open hostility toward Phillips and his religion and treated him differently from others similarly situated because of that religion. The Court noted ambiguous expressions from commissioners that could be taken either as reflecting resentment toward Phillips's religious views or simply the uncontroversial principle that "a business cannot refuse to provide services based on sexual orientation, regardless of" those views. *Id.* ("One commissioner suggested that Phillips can believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he decides to do business in the state.' A few moments later, the commissioner restated the same position: 'If a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise.'") (internal citations omitted).

These ambiguous statements were more sinister, however, in the context of another commissioner's naked hostility toward religion.

> Freedom of religion and religion ha[ve] been used to justify all kinds of discrimination throughout history, whether it be slavery,

29

> whether it be the Holocaust, whether it be—I
> mean, we—we can list hundreds of situations
> where freedom of religion has been used to
> justify discrimination.  And to me it is one of the
> most despicable pieces of rhetoric that people
> can use to—to use their religion to hurt others.

*Id*.  This, the Court noted, disparaged Phillips's religion "in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere."  *Id*.  By calling religion the "most despicable" way to justify hurting others, the comment also suggested that the commissioner thought Phillips's actions were worse *specifically because of* their religious character.

The inference that Phillips was treated worse because of his religion was bolstered by the Commission's different treatment of other bakers who refused to bake cakes bearing homophobic expressions.  The state Civil Rights Division found that these actions did not violate the state's civil rights laws because the requested message was offensive in nature.  *Id*. at 1730–31.  Thus it appeared that the state had "treated the other bakers' conscience-based objections as legitimate, but [Phillips's] as illegitimate—thus sitting in judgment of his religious beliefs themselves."  *Id*. at 1730.

Our Court's Free Exercise Clause jurisprudence in the wake of *Smith* and *Lukumi* likewise asks whether challengers have been treated worse than others who engaged in similar conduct because of their religious character.  For example, in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), we held unconstitutional the Newark Police Department's policy that officers could not have facial hair.  The Department had granted exceptions to this policy due to medical need, but would not grant similar exceptions to Sunni Muslims whose religion forbade them to

30

shave their beards. *Id*. at 360. This was "sufficiently suggestive of discriminatory intent . . . to trigger heightened scrutiny[,]" *id*. at 365, which the policy could not survive.

Similarly in *Tenafly Eruv Association v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002), the Borough of Tenafly had on its books an ordinance prohibiting the affixing of "any sign or advertisement, or other matter upon," among other things, telephone poles. *Id*. at 151. In practice, this ordinance was almost never enforced, and it was common to see house number signs, lost animal signs, commemorative ribbons, holiday displays, wreaths, and various other fixtures on the town's telephone poles. But when Orthodox Jewish residents sought to erect an *eruv* by placing *lechis* on utility poles,[10] the Borough refused to grant them a similar exemption and sought to enforce the ordinance. We held that the Borough thereby violated the Free Exercise Clause. Although the ordinance itself was general and neutral, such that *Smith* might apply, it had not been enforced evenhandedly. Instead, the Borough had an apparent practice of granting *ad hoc* exceptions but refused to make one for the Orthodox Jews' religious practice. This system of discretionary exemptions called for strict scrutiny (meaning they must be justified by a compelling government interest and narrowly tailored to achieve that compelling interest), and the Borough's actions could not survive.

---

[10] An *eruv* is a ceremonially created space outside of the home wherein Orthodox Jews may engage in the otherwise proscribed activities of pushing and carrying objects on the Sabbath. This can be done by placing *lechis*, thin black strips made of hard plastic and nearly identical to the coverings on ordinary ground wires, on utility poles to mark the boundaries of the *eruv*. 309 F.3d at 152.

31

These cases have in common that religiously motivated conduct was treated worse than otherwise similar conduct with secular motives. The ordinance in *Lukumi* was pretzeled to prohibit only Santeria ritual sacrifices and no other animal killings, even those no more humane or necessary. In *Fraternal Order of Police* the City of Newark granted exemptions to its facial hair policy for medical reasons but not for religious ones. In *Tenafly* an ordinance virtually never enforced was exacted exclusively on the religious practice of Orthodox Jews. And in *Masterpiece* the comments of Commission members, along with the disparate treatment of other bakers' secular claims of conscience, raised suspicion that Phillips had been treated more harshly because the Commission found his religious views offensive.

The question in our case, then, is whether CSS was treated differently because of its religious beliefs. Put another way, was the City appropriately neutral, or did it treat CSS worse than it would have treated another organization that did not work with same-sex couples as foster parents but had different religious beliefs? Based on the record before us, that question has a clear answer: no. The City has acted only to enforce its non-discrimination policy in the face of what it considers a clear violation.

As evidence that the City acted out of religious hostility, CSS first points to the City Council's resolution authorizing the Commission on Human Relations' inquiry, which stated that "Philadelphia has laws in place to protect its people from discrimination that occurs under the guise of religious freedom." But this comment falls into the grey zone identified by the Supreme Court in *Masterpiece*—a remark that could express contempt for religion or could merely state the well-established legal principle that religious belief will not excuse compliance with general civil rights laws. Unlike the commissioner in *Masterpiece* who suggested that religious

32

justifications for discrimination are merely rhetorical, here City officials repeatedly emphasized that they respected CSS's beliefs as sincere and deeply held. The Commission's May 7, 2018 letter, for instance, stated that "[w]e respect your sincere religious beliefs, but your freedom to express them is not at issue here where you have chosen voluntarily to partner with us in providing government-funded, secular social services." This is the kind of respectful consideration found lacking in *Masterpiece*, and nowhere in the record did the City depart from this respectful posture.

CSS next points to Commissioner Figueroa's statements during her meeting with Amato that "it would be great if we could follow the teachings of Pope Francis." Taken out of context, some might think this remark improper, as it has clear religious overtones. But context is important: the comment was made during a negotiation attempting to find a mutually agreeable solution to this controversy. In that light, Figueroa's statement is best viewed as an effort to reach common ground with Amato by appealing to an authority within their shared religious tradition. The First Amendment does not prohibit government officials working with religious organizations in this kind of partnership from speaking those organizations' language and making arguments they may find compelling from within their own faith's perspective. And though these attempts to persuade CSS were ultimately unsuccessful, the record does not suggest that the City then sought to punish it for this disagreement.

CSS also argues that Commissioner Figueroa's decision to call mostly religious foster care agencies to ask if they had a similar policy is evidence that the City impermissibly targeted religion. But focusing her inquiries on religious agencies made sense: the only agencies Figueroa knew that refused to work with same-sex couples—CSS and Bethany Christian—did so for religious reasons. She had little reason to think that

nonreligious agencies might have a similar policy. In fact, no other religious agency besides the two mentioned by the reporter had this policy, and Figueroa did call one secular agency as well.

Finally, CSS points to several public statements (the most recent of which occurred in 2015) made by Mayor Kenney critical of the Archdiocese of Philadelphia and of Archbishop Chaput. No doubt the Mayor expressed concerns toward the local Catholic Church, with a particular focus on the Church's stance on gay rights. But CSS's claim that he "prompted" Human Services' 2018 inquiry in this case misstates the record. Figueroa testified that she discussed the issue with the Mayor prior to meeting with Amato and told the Mayor she would brief him once a decision had been made. There is nothing in the record before us suggesting that he played a direct role, or even a significant role, in the process.

The evidence CSS offers of religious bias or hostility appears significantly less than what was present in *Lukumi* or even in *Masterpiece*. Nor is there much to suggest that the City treated CSS differently because of its religion. It argues that it has been subject to selective enforcement, akin to that in *Tenafly* and *Fraternal Order of Police*, because the City adopted what CSS sees as novel legal arguments invented during this controversy to justify its actions against CSS. First, it claims that the City had never previously taken the position that the Fair Practices Ordinance applies to the screening of foster parents. But nothing before us suggests that the City took this position disingenuously or as a pretext for persecuting CSS. Its interpretation of the Ordinance, with which the District Court agreed, was hardly frivolous. Nor is it suspicious that the City had never previously taken this position: the record contains no evidence of any foster care agencies discriminating in ways that would violate the Fair

34

Practices Ordinance prior to this controversy. The issue simply seems not to have come up previously.

Second, CSS argues that the City created what CSS calls a "must-certify policy" as a justification for the actions against it. The City's position, according to CSS, is that foster agencies must at least evaluate any applicants who come to them seeking to become foster parents rather than referring them to a different agency—although agencies would retain their discretion whether to certify an applicant as fit after evaluation. CSS perceives that the City would object to any referral, and it argues that this was a novel position adopted during this controversy. Amato testified that referrals from one agency to another are a routine way of finding the best fit for a given applicant. But the record here is unclear, both as to the City's current position and as to its policy prior to this case. The former is not necessarily an objection to any referrals at all so much as an objection to referrals made for an improper basis, *i.e,*. that the referring agency refuses to work with members of a protected class. As to the latter, the referrals Amato described may have only involved an agency suggesting that a family might prefer a different agency rather than refusing to work with a particular applicant outright. It would be consistent for the City to insist that, while agencies are free to inform applicants if they believe a different agency would be a better fit, they must leave the ultimate decision up to the applicants. In any case, this dispute does not indicate improper religious hostility on the City's part, only a routine regulatory disagreement.

Third, CSS argues that the City has acted inconsistently because Human Services will consider factors such as race or disability when placing foster children with foster parents. But there are many differences between CSS's behavior and the City's consideration of race or disability when placing a foster child. Most significantly, unlike CSS, Human Services never

35

refuses to work with individuals because of their membership in a protected class. Instead it seeks to find the best fit for each child, taking the whole of that child's life and circumstances into account.[11] And there is no instance in the record of Human Services knowingly permitting any other foster agency to discriminate against members of a protected class.

In sum, at the preliminary injunction stage CSS shows insufficient evidence that the City violated the Free Exercise Clause. The Fair Practices Ordinance has not been gerrymandered as in *Lukumi*, and there is no history of ignoring widespread secular violations as in *Tenafly* or the kind of animosity against religion found in *Masterpiece*. Here the City has been working with CSS for many decades fully aware of its religious character. It continues to work with CSS as a congregate care provider and as a Community Umbrella Agency even to this day despite CSS's religious views regarding marriage. And the City has expressed a constant desire to renew its relationship with CSS as a foster care agency if it will comply with the City's non-discrimination policies protecting same-sex couples.

CSS sees the City's non-discrimination policy as a pretext to exclude it from public life because of its religious character, and invokes *Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012 (2017), in which the Supreme Court held unconstitutional rules excluding religious organizations

---

[11] The issue of race in foster care and adoption is notoriously thorny and complex, and is the subject of considerable scholarly literature. *See, e.g.*, PACT: An Adoption Alliance, *Biracial, Multiracial, Interracial Identity in Adoption* (accessed March 11, 2019), http://www.pactadopt.org/resources/biracial-multiracial-adoption-identity.html (collecting scholarly articles).

from a public grant program. CSS's counsel at oral argument described the proposed contract language expressly forbidding discrimination on the basis of orientation as a "poison pill." Tr. of Oral Arg. at 61. CSS likewise states in its brief that "[t]he City thus proposes to change its foster care contract specifically to prohibit [CSS's] religious exercise." Appellant's Reply Br. at 3. But it can point to no specific evidence demonstrating that the City acted other than out of a sincere commitment to equality and non-discrimination.

CSS's theme devolves to this: the City is targeting CSS because it discriminates against same-sex couples; CSS is discriminating against same-sex couples because of its religious beliefs; therefore the City is targeting CSS for its religious beliefs. But this syllogism is as flawed as it is dangerous. It runs directly counter to the premise of *Smith* that, while religious belief is always protected, religiously motivated conduct enjoys no special protections or exemption from general, neutrally applied legal requirements. That CSS's conduct springs from sincerely held and strongly felt religious beliefs does not imply that the City's desire to regulate that conduct springs from antipathy to those beliefs. If all comment on religiously motivated conduct by those enforcing neutral, generally applicable laws against discrimination is construed as ill will against the religious belief itself, then *Smith* is a dead letter, and the nation's civil rights laws might be as well. As the Intervenors rightly state, the "fact that CSS's non-compliance with the City's non-discrimination requirements is based on its religious beliefs does not mean that the City's enforcement of its requirements constitutes anti-religious hostility." Intervenor's Br. at 22.

We thus believe the District Court did not abuse its discretion in finding that CSS has failed to demonstrate a sufficient likelihood of success on the merits of its Free Exercise Clause claim.

37

## B. The Establishment Clause

CSS argues that the City's actions violated not only the First Amendment's Free Exercise Clause but also its Establishment Clause. "The clearest command of the . . . [Establishment] Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). In this case, the two Religion Clauses largely run together: insofar as CSS alleges that it has been blacklisted for its religious beliefs, it is alleging both a Free Exercise violation (persecution for its religious views) and an Establishment Clause violation (the City declaring some religious viewpoints favored and others disfavored).

Insofar as the Establishment claim here is analytically independent of the Free Exercise claim, CSS contends the City has dictated its preferred religious viewpoint—that religious institutions should recognize the marriage of same-sex couples—and has conditioned CSS's future contract on adherence to that perspective. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 588 (1992) (prayer at public high school graduation violated the First Amendment, in part because the government not only chose the clergyman but imposed guidelines on the composition of his prayer). To support this claim it focuses primarily on Commissioner Figueroa's statement in her meeting with Amato that "it would be great if we could follow the teachings of Pope Francis." CSS sees this as the City telling it which religious leaders to follow and how to interpret their teachings, and then "punishing" it when it refused to comply. *See* Appellant's Br. at 38–40.

If the City truly were punishing CSS for refusing to adopt its preferred view of Catholic teaching, no doubt that would be an impermissible establishment of religion. But that is not what happened here. Human Services still works with

CSS as a congregate care provider and a Community Umbrella Agency. It still works with Bethany Christian as a foster care agency, even though Bethany also maintains its religious opposition to same-sex marriage. This supports the view that CSS is not being excluded due to its religious beliefs. Indeed, the City has maintained its other relationships with CSS and has merely insisted that, if CSS wants to continue providing foster care, it must abide by the City's non-discrimination policy in doing so. There is simply no evidence that this is a veiled attempt to coerce or impose certain religious beliefs on CSS.

The District Court thus did not abuse its discretion in finding that CSS has not shown a likelihood of success on the merits of its Establishment Clause claim.

### C. Freedom of Speech

In addition to its claims under the First Amendment's Religion Clauses, CSS also claims that the City has violated its freedom-of-speech rights in two different ways: by compelling it to speak in ways it finds disagreeable and by retaliating against it for engaging in protected speech.

#### i. Compelled Speech

For over 70 years it has been axiomatic that the Free Speech Clause also protects the right not to speak. *See W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) ("To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind."). CSS claims it has been compelled to speak because Pennsylvania law imposes a requirement that, after evaluating prospective foster parents, an agency must "give written notice to foster families of its decision to

approve, disapprove or provisionally approve the foster family." 55 Pa. Code § 3700.69. Because the City forbids CSS from finding an applicant unqualified for a "discriminatory reason," including their sexual orientation or same-sex relationship, it is therefore forcing CSS "to make written endorsements that violate its sincere religious beliefs." Appellant's Br. at 53.

The problem with this argument is that the ostensibly compelled speech occurs in the context of CSS's performance of a public service pursuant to a contract with the government. In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court upheld conditions on government grants under Title X of the Public Health Service Act preventing grant programs from providing to their patients not only abortion services but also counseling or information about abortion. *Id*. at 193–200. The Court held that this was not an impermissible restriction on speech or viewpoint discrimination because the government is free to fund only those programs that comport with its own view on matters such as abortion.

*Agency for International Development v. Alliance for Open Society International*, 570 U.S. 205 (2013) ("*AOSI*"), clarified this rule by holding that, while the government may place conditions on the use of public grant monies, it may not require grant recipients to adopt the government's views as their own. Thus, the requirement that organizations receiving money to combat HIV/AIDS not use that money "to promote or advocate the legalization or practice of prostitution or sex trafficking," 22 U.S.C. § 7631(e), was acceptable under *Rust*. But the rule that no funds could be used by any organization "*that does not have a policy* explicitly opposing prostitution and sex trafficking," *id*. § 7631(f) (emphasis added), unconstitutionally compelled speech. It did not simply tell grant recipients how to use the government's money, but required them to affirm their own agreement with the

40

government's policy—not unlike the requirement in *Barnette* that schoolchildren recite the Pledge of Allegiance.

CSS argues that it has been required to adopt the City's views about same-sex marriage and to affirm these views in its evaluations of prospective foster parents, and that this violates the rule of *AOSI*. It contends that the speech in question is beyond the scope of its contract with the City because the requirement of performing evaluations comes from state law rather than from the contract itself, and because the compensation formula in the contract is not tied to the number of evaluations performed. We disagree. The speech here only occurs because CSS has chosen to partner with the government to help provide what is essentially a public service. The exact allocation of responsibility between the Commonwealth and the City, or the funding structure in the contract, does not change that. Neither *Rust* nor *AOSI*, nor any other relevant precedent, focused on the precise funding structure of the government contracts at issue. Instead, the cases focus on whether the condition pertains to the program receiving government money, as the City's non-discrimination requirements do here.

The City would violate *AOSI* if it refused to contract with CSS unless it officially proclaimed its support for same-sex marriage. But to the contrary, the City is willing to work with organizations that do not approve of gay marriage, as its continued relationship with Bethany Christian, its continued relationship with CSS in its other capacities, and its willingness to resume working with CSS as a foster care agency attest. It simply insists that CSS abide by public rules of non-discrimination in the performance of its public function under any foster-care contract. Therefore CSS's compelled speech claim does not at this time have a reasonable likelihood of success, and the District Court did not abuse its discretion in so holding.

41

*ii. Speech Retaliation*

To prevail on a speech retaliation claim, a plaintiff must show that it engaged in constitutionally protected activity, that the government responded with retaliation, and that the protected activity caused the retaliation. *See Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). This rule is a straightforward application of the First Amendment's basic command that the government may not punish those who utter protected speech. Where the plaintiff is a government employee, additional considerations come into play, and the plaintiff's speech is only protected if it occurred in his or her capacity as a citizen rather than as a public employee. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

CSS argues that it provides foster care services as a religious ministry protected by the First Amendment and that it "engages in protected speech when it evaluates families" as potential foster parents. *Id.* It also asserts retaliation against it for statements made to the *Inquirer*, and for its subsequent statements to Human Services confirming that it would not work with same-sex couples as foster parents.

This claim is unlikely to succeed because the City's actions were regulatory rather than retaliatory in nature. The speech retaliation doctrine is implicated where the government has taken some action against an individual ostensibly unrelated to that individual's protected speech yet motivated by a desire to retaliate. *See, e.g.*, *Eichenlaub*, 385 F.3d at 282–85 (approving retaliation claim alleging that the Township denied building permit applications to punish a landowner's speech at a public meeting). Here, on the contrary, the City has directly regulated the very conduct CSS claims is constitutionally protected: its refusal to evaluate or work with same-sex couples. Thus the City has "retaliated" against CSS

42

only in the same way enforcement of any government regulation "retaliates" against those who violate it.

Insofar as CSS claims it was subject to retaliation for its statements to the *Inquirer* and to Human Services confirming that it engages in the discriminatory conduct to which the City objects, this too cannot support a valid retaliation claim. We do not read the City's actions as punishing CSS for those statements rather than for the discriminatory conduct itself. Once again, the District Court did not abuse its discretion in ruling that CSS has failed to establish a reasonable likelihood of success on its speech retaliation claim.

### D.  The Pennsylvania Religious Freedom Protection Act

CSS's final claim is under the Pennsylvania Religious Freedom Protection Act (RFPA), 71 Pa. Stat. Ann. § 2401 *et seq*. Similar in some ways to the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*., the RFPA generally provides that "an agency shall not substantially burden a person's free exercise of religion, including any burden which results from a rule of general applicability." It may do so, however, if it proves by a preponderance of the evidence that the burden both is "(1) [i]n furtherance of a compelling interest of the agency" and is "(2) [t]he least restrictive means of furthering the compelling interest." 71 Pa. Stat. Ann. § 2404. "Substantially burden" is defined as an action that does any of the following:

> (1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs[;]

> (2) Significantly curtails a person's ability to express adherence to the person's religious faith[;]

43

(3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion[;]

(4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

*Id*. § 2403. CSS argues that all four forms of substantial burden exist here. Its argument as to each prong ultimately rests on this: CSS's foster care work is part of its religious ministry, its religious convictions prevent it from "endorsing" same-sex marriage, and under the City's policies it may not engage in its foster care ministry while abiding by its convictions. Thus, CSS must choose either endorsing a viewpoint that violates the tenets of its faith or ceasing its religious ministry of providing foster care.

Pennsylvania courts applying the RFPA scrutinize claims of religious burden to see whether the burdened activity is truly "fundamental to the person's religion." *See, e.g.*, *Commonwealth v. Parente*, 956 A.2d 1065, 1074 (Pa. Commw. Ct. 2008) ("Parente never testified that his activities . . . constitute 'activities which are fundamental to his religion' . . . . Rather, at best, Parente's testimony merely establishes that he engaged in these activities based upon his religious beliefs or that they flowed from a religious mission."). [12]

---

[12] This is different than the federal Religious Freedom Restoration Act and Supreme Court jurisprudence, which does not delve into investigating a person's religious beliefs. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724

44

In *Ridley Park United Methodist Church v. Zoning Hearing Board Ridley Park Borough*, 920 A.2d 953 (Pa. Commw. Ct. 2007), for instance, the Pennsylvania Commonwealth Court held that a church was not entitled to a RFPA exemption from a local zoning code in order to operate a daycare center on its property. While the daycare center "aided in carrying out the Church's religious mission," it was not a "fundamental religious activity of a church." *Id.* at 960. By analogy, "ministering to the sick can flow from a religious mission, but it is not a fundamental religious activity of a church because a hospital may be built to satisfy that mission." *Id.* Thus it appears that Pennsylvania courts consider an activity "fundamental to a person's religion" if it is an inherently religious activity as opposed to something that could be done either by a religious person or group or by a secular one. The parallel here is direct: caring for vulnerable children can flow from a religious mission, but it is not an intrinsically religious activity under Pennsylvania law.

It thus seems unlikely that the Pennsylvania courts would recognize a substantial burden on CSS's exercise of religion in this case. We have noted before, however, that this facet of RFPA jurisprudence "appears to create some tension between state and federal law," as the "Supreme Court has cautioned against making religious interpretations in the First Amendment context." *Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 258 (3d Cir. 2008) (Scirica, J., concurring); s*ee also Smith*, 494 U.S. at 886–87 ("It is no more appropriate for judges to determine the 'centrality' of religious beliefs . . . in

---

(2014) ("Arrogating the authority to provide a binding national answer to this religious and philosophical question, HHS and the principal dissent in effect tell the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step.").

the free exercise field . . . than it would be for them to determine the 'importance' of ideas . . . in the free speech field.").

Thus we make clear that even if we were to assume there is a substantial burden here, CSS is not likely to prevail on its RFPA claim because the City's actions are the least restrictive means of furthering a compelling government interest. It is black-letter law that "eradicating discrimination" is a compelling interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). And mandating compliance is the least restrictive means of pursuing that interest. *See Hobby Lobby*, 573 U.S. at 733 ("The Government has a compelling interest in providing equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *see also E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 594 (6th Cir. 2018) (denying several alternative means of enforcing the government's interest in preventing discrimination against transgender employee in favor of simply enforcing the ban on that discrimination).[13]

---

[13] Note that this "strict scrutiny" test under RFPA is different from the strict scrutiny that would apply under *Lukumi*, *Fraternal Order of Police*, and *Tenafly* if Catholic Social Services were able to demonstrate religious targeting or enforcement disparities. In the latter case, we would examine not the general interest behind the City's anti-discrimination laws but the specific interest in the different enforcement of those laws against religious and secular groups. *See Tenafly*, 309 F.3d at 172 (applying strict scrutiny to the Town's justifications for treating *lechis* differently from those

CSS offers several reasons why the City has no compelling interest in enforcing the Fair Practices Ordinance here. First, it asserts that evaluating potential foster parents is not a public accommodation. Second, it calls the harm the City seeks to prevent speculative, citing *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 799–800 (2011), for the principle that "ambiguous proof" of speculative harms will not suffice to provide a compelling interest. Finally, it argues that the City cannot have a compelling interest in preventing it from discriminating because doing so will not increase the number of foster agencies willing to work with same-sex couples: either the City allows CSS to continue discriminating, in which case there are 29 agencies willing to work with those applicants, or it ceases operation altogether, in which case there will still be 29 agencies willing to work with those applicants.

These arguments miss the mark entirely. The government's interest lies not in maximizing the number of establishments that do not discriminate against a protected class, but in minimizing—to zero—the number of establishments that do. And that interest is by no means limited to public accommodations as defined by the Fair Practices Ordinance. Thus, even if we were to assume that evaluating potential foster parents is not a public accommodation, the City would still have a compelling interest in adding a non-discrimination provision to future contracts.

Nor is the harm the City seeks to prevent speculative. *Brown* held that a law restricting violent video games, on the

violations of the ordinance it had long tolerated). That would be a more difficult burden for the City to bear than under the RFPA, where the question is simply the weight of the government's interest in enforcing its anti-discrimination laws generally.

47

theory that they would make children become more violent, could not be sustained, in part due to the lack of sound empirical support for this theory. *See* 564 U.S. at 800–01. This has no application here, where the mere existence of CSS's discriminatory policy is enough to offend the City's compelling interest in anti-discrimination. CSS notes that no same-sex couples have ever—so far as the record reflects—approached it seeking to become foster parents. This is not surprising given the Philadelphia Archdiocese's well-known opposition to gay marriage. But this is beside the point. The harm is not merely that "gay foster parents will be discouraged from fostering." Appellant's Br. at 63. It is the discrimination itself.

So even if CSS could show a substantial burden on its religious exercise as defined by the RFPA, the City's actions appear to survive strict scrutiny. Thus the District Court did not abuse its discretion in determining that CSS has not established a reasonable likelihood of success on the merits of its RFPA claim.

### E. Other Preliminary Injunction Considerations

We conclude, as the District Court did, that at the preliminary injunction stage and on the record before us, CSS is not reasonably likely to succeed on the merits of any of its claims. This alone defeats the request for a preliminary injunction. *See Reilly*, 858 F.3d at 179. In any event, we also agree with the District Court that CSS has not met the other factors considered for a preliminary injunction.

To prevail, CSS must show not only a reasonable likelihood of success but also that it is more likely than not to suffer irreparable harm without an injunction. It identified several alleged irreparable harms before the District Court, but on appeal it wisely focuses on the prospect that, without a

48

contract from the City, it will go out of business. Arguably even this would be compensable through money damages. *Cf. Lehigh Valley Cmty. Mental Health Ctrs., Inc. v. Pa. Dep't of Human Servs.*, 2015 WL 6447171 at *3 (E.D. Pa. 2015) (finding that the threat of going out of business did not qualify as an irreparable injury). In any case, CSS has not met its burden of demonstrating that it is more likely than not to suffer this injury. Its congregate care and Community Umbrella Agency functions are unaffected, it has other foster care contracts with neighboring counties, and even as to its foster care services in Philadelphia CSS cites only to Amato's self-professed "guess" that it would have to cease those operations within months.

Even if CSS could establish both of the gatekeeping factors—likelihood of success on the merits and irreparable harm—neither the balance of the equities nor the public interest would favor issuing an injunction here. The District Court set out at length the City's interests in requiring CSS to abide by its nondiscrimination policy, *see Fulton v. City of Philadelphia*, 320 F. Supp. 3d. at 703–04, and we agree that the City's interests weigh substantially in its favor—particularly in ensuring that government services are open to all Philadelphians. Placing vulnerable children with foster families is without question a vital public service, no doubt why there are 29 other foster care agencies, including Bethany Christian, that provide this service. Deterring discrimination in that effort is a paramount public interest.

### F. Conclusion

The City stands on firm ground in requiring its contractors to abide by its non-discrimination policies when administering public services. Under *Smith*, the First Amendment does not prohibit government regulation of religiously motivated conduct so long as that regulation is not

49

a veiled attempt to suppress disfavored religious beliefs. And while CSS may assert that the City's actions were not driven by a sincere commitment to equality but rather by antireligious and anti-Catholic bias (and is of course able to introduce additional evidence as this case proceeds), the current record does not show religious persecution or bias. Instead it shows so far the City's good faith in its effort to enforce its laws against discrimination.

Hence we hold that the District Court did not abuse its discretion in denying the motion for preliminary injunctive relief and affirm its thorough and well-reasoned decision.